TONOPAH & SALT LAKE MIN. CO. v. TONOPAH MIN. CO. OF NEVADA.

(Circuit Court, D. Nevada. August 3, 1903.)

No. 735.

1. MINING CLAIMS — CONFLICTING BOUNDARIES — RECOGNITION OF LINE AS BOUNDARY.

The locator of a mining claim ran his end line across the side line of a prior claim in order to make his end lines parallel, but with the intention, as declared in his certificate of location, not to claim anything within the lines of the other claim. On a subsequent survey of the latter its side line was moved further outward, over the newer claim, and so marked by monuments, and an amended certificate of location was filed to conform thereto. Later the new claim was also surveyed by the same surveyor, one purpose being to establish the boundary between the two claims; and the locator, as shown by a preponderance of the evidence, recognized the side line of the older claim, as established by the survey, as the true boundary, and claimed nothing beyond it. *Held*, that it was competent for the parties to adopt such line as the boundary between them, whether the correct one or not, and that such action was binding upon them and their subsequent grantees.

Suit in Support of Adverse Claim to Mining Ground.

Dickson, Ellis & Ellis and Key Pittman, for complainant.

W. E. F. Deal, Kenneth M. Jackson, and Campbell, Metson & Campbell, for defendant.

HAWLEY, District Judge.   This suit is brought in support of an adverse claim made by complainant, as the owner of the Wandering Boy mining claim, against the application for a patent made by the defendant to the Butler group of mines, situate in Tonopah mining district, Nye county, Nev., and is one of the three cases referred to in the opinion in No. 734 (125 Fed. 389).   It will be noticed from an examination of the diagram inserted in that case that the Wandering Boy, as located, overlaps the Valley View in the form of a triangle. The complainant makes no claim whatever to any part of the ground within this triangle that is situated north of the ground marked in yellow on the diagram.   The dispute between the parties is confined to that portion in yellow situate between the northeasterly and southwesterly side line and the northeasterly end line of the Wandering Boy.   It is described in the bill of complaint as follows:

"Beginning at a point which is north, 55° 23' west, 286.5 feet distant from corner No. 8 of said Wandering Boy claim, and running thence on a true course north, 55° 23' west, 13.9 feet, to corner No. 7 of said Wandering Boy claim; thence north, 46° 31' west, 301 feet, to corner No. 6 of said Wandering Boy claim;   thence south, 50° 27' west, 235.5 feet, to corner No. 5 of said Wandering Boy claim;   thence south, 39° 38' west, 8.7 feet, to a point on the southerly side line of said alleged Valley View claim, as surveyed for patent; thence south, 82° 02' east, 421.1 feet, to the place of beginning;   containing 0.872 acres."

The side lines of the Wandering Boy, marked in black on the diagram, measure in length 1,553 feet.   Deducting the excess over 1,500 feet therefrom brings the northeasterly end line down to the line in red from F to G on the diagram.

The contention of complainant is substantially the same as made in the Pyramid Case with reference to the dropping of the east end line southerly 83 feet;   the difference in the cases being that the Wandering Boy was located, and certificate of location recorded, prior to the recording of the amended location certificate of the Valley View, instead of subsequent, as in the case of the Pyramid in No. 734.

The Wandering Boy was located September 9, 1900, by Edward Clifford, Jr.   A notice was posted on the ground by the Cliffords. Mr. Butler thereafter called their attention to the fact that the notice was defective, and, among other things, suggested they had not given any name to the claim.   They requested him to name it.   He said Ed had often expressed great pleasure in listening to a famous song: "I will name it the Wandering Boy to remind him of it."   This original notice of location was not introduced, but the certificate of location was.   It bears date December 5, 1900, and was recorded on that date.   It refers to the original location, and states, in giving the description, "This claim joins the south side line of the Valley View claim."   It contains the further statement that "the north corner of said claim overlaps the Valley View claim; said ground lying within the south side line of the Valley View claim, which is included within this Wandering Boy claim, to belong to the Valley View."   In an additional and amended certificate of location, dated May 29, 1901, and recorded July 7, 1901, defining the Wandering Boy by metes and

bounds, is the statement "intersects south line of Valley View lode at its middle point."

The controversy in this case is principally one of fact. It depends upon the proper solution of the question as to where the south side line of the Valley View was at the time the Wandering Boy was located, and where it was at the time the owner of the Wandering Boy filed the additional and amended certificate of location. The lines in relation to these points are sharply drawn. There is upon some of the points a direct conflict in the evidence, which is somewhat difficult to unravel or make clear, and there are other points in connection therewith which are undisputed. There is in this case, as well as in case No. 736 (125 Fed. 408), a long history as to the manner in which the early locations were made in the Tonopah mining district. Conspicuously in the foreground stands the original discoverer, J. L. Butler, who was the active and moving spirit that directed all the locations involved in these two suits, as well as other locations made in the immediate vicinity. After Butler had made the discoveries mentioned in case No. 734, he notified the Cliffords thereof, and suggested that they ought to go to the new district and locate some mining claims. They had no knowledge of mining, but had faith in Butler as a friend, appreciated his friendship, and acted upon his suggestion. The complainant's case rests entirely upon the testimony of Edward Clifford, Sr., and Edward Clifford, Jr., from whom complainant derives title. Prior to any statement or review of their testimony, it is deemed proper to say that the Cliffords, father and son, had lived upon a ranch for several years; that they had no experience in mining; that their memory and recollections of the events that transpired at Tonopah were not clear upon many points; that they often became confused in giving their testimony (they were not, however, the only witnesses that became confused); that they evidently had but little experience as witnesses, and were unable at all times to comprehend the questions asked by the respective counsel, and were easily led into making answers contradictory of their first statements. They were called and recalled, examined and re-examined and cross-questioned, to explain their testimony, and at times lost their bearings. It is difficult to review such testimony.

Mr. Edward Clifford, Sr., testified: That after his arrival with his son at Tonopah in September, 1900, he found where Mr. Butler had made some locations, and went prospecting around to see if he could not find something—some ground that he could take up. That he went upon what is called the "Valley View Ground," and thought he would take the course of the Valley View ledge, and would locate across the cañon. He told his son where that ledge crossed through a cañon, and went off with a hammer in his hand, breaking rock around, and went across what is called "Gold Hill" now, and came right down and found some rock cropping out, and that his son located the claim known as the Wandering Boy. That they first intended to locate the claim east and west, parallel with the Valley View. That he knew at the time of the location of the Wandering Boy where the southwest and southeast corners of the Valley View were, and saw the monument marking the south side center of the Valley View,

that after making the location he had it surveyed by W. C. Gayhart. He and his son Edward and a man named Roddick assisted, and Gayhart had Mr. Egan and Mr. Miles assisting him.   Upon his cross-examination he was asked:

"Q. For what purpose was the survey made?  A. My monuments on the claim was knocked down right along.  Every time I would go over the ground I would find monuments knocked down, and I spoke to the boys that we ought to have it surveyed.  So my son went and seen Mr. Gayhart, and got him for to survey the ground.  Q. Wasn't it surveyed for the purpose of establishing the line between the Wandering Boy and the Valley View?  A. I suppose it was.  Q. When Mr. Gayhart surveyed it, had your monuments then been knocked down—the ones which you erected prior to that time? A. Yes, sir; I put them up many times.  Q. At the time of the survey, had they been knocked down?  *  *  *  A. Well, now, I could not say whether they were down then or not.  *  *  *  Q. I come back now to where we were talking about yourself and Mr. Butler at the time of the Gayhart survey.  You didn't intend to claim any of the Valley View claim as it was located at that time, but you wanted all that was south of the Valley View. That is a fact?  A. Yes, sir.  Q. And that is because Mr. Butler and you were friendly, and you wanted to adjust the lines between your mining claims?  A. Yes.  Q. And that was the only reason of the survey?  A. No, sir; that was not the reason of the survey, altogether.  If my monuments had not been knocked down, we would not have had it surveyed at all.  Q. Having it surveyed, that was what you wanted Mr. Gayhart to do—to establish the line as it existed between you and the Valley View, as it existed then?  A. To establish the whole line, clean around the claim.  Q. And you all the time didn't want any of the claim that was at that time within the lines of the Valley View, did you?  A. I wanted nothing belonging to the Valley View.  I didn't want any ground belonging to the Valley View."

It will thus be seen that the object of this survey was to establish the line between the Wandering Boy and the Valley View, that at the time of making this survey it was his intention to establish the south line of the Valley View as the northerly boundary of the Wandering Boy, that they understood at the time of fixing the boundaries that Mr. Gayhart had surveyed the Valley View ground, and they did not intend to infringe upon any portion of the Valley View claim.

The contention of counsel presents the question whether the Cliffords meant the line first established by Butler before, or the line established after, the easterly end line of the Valley View was dropped down, as stated in the former opinion, No. 734.   On the redirect examination of Edward Clifford, Sr., the counsel for complainant brought out the evidence upon which it relies to establish its contention.

"Q. When you say you didn't want any ground belonging to the Valley View, you mean the ground originally located by Mr. Butler, or the ground surveyed by Mr. Gayhart?  A. The ground that was originally located by Mr. Butler.  Q. When Mr. Gayhart got through surveying the Valley View, was there any difference between it and the way it was when Mr. Butler located it?  A. Yes, sir.  Q. What was the difference?  A. The northeast corner of the Valley View was originally downhill, and the southeast corner of the Valley View was run down a hill.  *  *  *  south.  I could not exactly state how much, but quite a ways.  Q. Did you intend to give any of that ground that he had run down the hill up to the Valley View?  A. No, sir. *  *  *  Q. Now, Mr. Clifford, at the time that Mr. Gayhart was surveying the Wandering Boy claim did you then know that he had dropped the south line of the Valley View to the south?  A. I did not."

He then testified as to the details, stepping off the ground from point to point. Upon his cross-examination, touching these details, he was asked:

"Q. But before you put your monuments up, the Valley View had their monuments up, didn't they? A. Yes. Q. But at the time you did the stepping the Valley View didn't have their monuments up? A. No, sir. * * * Q. Is it not a fact that, at the time the Gayhart survey was made, you knew that prior to that time Mr. Gayhart had surveyed the Valley View claim? A. Well, I heard it. Q. You had heard that it had been surveyed before this? A. Yes. Q. And you had heard that the corners had been dropped, hadn't you? A. No, sir; I don't think I had. Q. Didn't you know that? A. No, sir; I didn't know that the corners had been dropped. Q. At any rate, you did erect monuments in March, 1901, on the line of the Gayhart survey, which was made for you and under your pay, did you not? * * * A. Yes. Q. Mr. Gayhart put down pins or pegs in the earth where the monuments should be erected, and you, or people in your employ, erected those monuments where Mr. Gayhart put the pins, didn't they? A. Yes."

On redirect examination he testified that the first knowledge he had that the east end line of the Valley View had been moved down was "when I got these maps from Mr. Gayhart." Upon his recross-examination, referring to his testimony on behalf of complainant, he was asked: "Q. Did you see any indication that the south center point of the Valley View side line had been shifted also? A. No, sir."

As stated in the opinion in No. 734, from the start to the finish of these cases the testimony virtually unites upon the point that the south side center monument of the Valley View remained substantially at the point where first erected.

Edward Clifford, Jr., testified that he went with his father to Tonopah.

"We got into Tonopah, I think, between the 4th and 9th day of September. We found where Mr. Butler had located some mines there, and we prospected around to see if we couldn't find some. So we made one location, now called the 'Wandering Boy.'" That he located and built the original monuments on the Wandering Boy. That afterwards his father had other monuments built around the lines of this location. "I don't know what his object was in placing them there. * * * Q. Do you know whether or not your father tried to find the south line of the Valley View claim, or where it would be? A. Yes, sir; I believe he did. Q. Did you see him attempting to do that? A. Yes, sir. Q. Well, what did he do? * * * A. I think he stepped off from the west end line of the Valley View. Q. Do you know when the original monuments were put up on the Wandering Boy lode? A. Yes, sir; they were put up on the 9th of September. Q. Do you know when the claim was monumented by marking the boundaries? A. Within the ninety days. * * * We had ninety days to do our work and erect our monuments. Q. At that time were the monuments up on the Valley View? A. Yes, sir; I believe they were. I think they were. Q. Do you remember when the Gayhart survey took place? A. Yes, sir. Q. Do you know whether or not, according to Mr. Gayhart's survey, the Valley View claim differed from what it was originally located? A. No, sir; I do not."

He testified upon his cross-examination that he did not pay much attention to the monuments of either the Valley View or the Wandering Boy; that he secured Mr. Oddie to make out the certificate of location—the first paper filed outside of the location notice—but could not say whether he signed it or not.

"Q. Mr. Clifford, did you know the monuments of the Valley View ground prior to March, 1901—before March, 1901? A. Yes, sir; some of them. Q.

You had helped Mr. Knapp, had you not, run some lines there? A. Yes. sir; I did. Q. Now, you were there with Mr. Knapp in January, 1901, was it not? A. Yes, sir; I believe it was. * * * Q. In the Knapp survey, did you not start at what was termed the southwest corner of the Valley View claim, and run east? A. Well, to tell you the truth, I could not say where we did start from. Q. Can you tell me whether or not in that survey which you know or was pointed out to you to be the south side center line of the Valley View? A. No, sir. Q. You don't know much about the boundaries? A. No; I do not. Q. And you don't know much about the mine, the Wandering Boy or the Valley View, either? A. No. Q. You didn't pay any particular attention to it? A. No, sir; I did not."

On behalf of defendant a number of witnesses were introduced. Mr. Knapp, among other things, testified that he first took the position of the south center side line of the Valley View on January 26, 1901, accompanied by Edward Clifford, Jr., who at that time pointed out to him "the north end line of the Wandering Boy, and the south center side line of the Valley View"; that he had occasion to examine the south side center of the Valley View recently, and found the monument in the same place it was in January, 1901. Mr. Oddie testified that the Gayhart survey of the Valley View was made prior to March 20, 1901; that the survey of the Wandering Boy was made about one month afterwards; that he erected the monument on the south line of the Valley View claim, which is called the "South Side Center Monument," prior to November 24, 1900, and that at no time since has that monument been moved to the north or to the south; that it was there at the time of the survey of the Wandering Boy; that Mr. Edward Clifford asked him to draw the certificate of location of the Wandering Boy, and gave him the initial points.

"I knew that it joined the Valley View on the south and overlapped it. Well, he told me, or I suggested to him putting a monument inside of, the Valley View to square his end lines—parallel his end lines—and he said that would be a good idea, and he would not claim any of the ground inside; and I wrote the description of the monuments, and numbered each one carefully, and wrote in the certificate exactly what each monument was, and told him to be careful and build his monuments where I had indicated, and mark them exactly that way. I had helped him before, and I did the same thing with his other claims. Q. Now, as I understand it, at the time you made the certificate of location for Mr. Clifford, the monuments had not been permanently erected on the ground? A. I never had seen them, and he told me they were not, and I advised him to put them up within ninety days. He told me he was going to do it, and I impressed upon him the necessity."

W. C. Gayhart testified: That he made a survey of the Wandering Boy claim, for the Cliffords, who were with him during the survey, about one month after he had surveyed the Valley View. That at the time of the survey of the Wandering Boy he pointed out and explained to the Cliffords, father and son, the south side line of the Valley View as established by his survey thereof. That they were at the time of this explanation near the south side center Valley View monuments. Mr. Clifford, Sr., said that—

"He claimed no ground inside of the Valley View. He claimed the Wandering Boy, but no ground that belonged to the Valley View, or that was included in the lines of the Valley View, and that was in response to my running the end line of the Valley View in order to make both end lines parallel, and he understood that the block of ground in there did not belong to the Wandering Boy. * * * I explained to him that * * * a part of

the claim was in conflict with the Valley View, and that was ground that belonged to the Valley View claim, and he said that he so understood it, and, of course, did not claim it, but he wanted the ground southerly from the Valley View, as included in the Wandering Boy ground."

Edward Clifford, Sr., was called in rebuttal by complainant, and testified that Mr. Gayhart did not show or tell him that "he had surveyed the south line of the Valley View claim." On his cross-examination in rebuttal he said that Mr. Gayhart, when making the survey of the Wandering Boy, did not "say anything at all—not a word."

Edward Clifford, Jr., was called in rebuttal, and upon his cross-examination testified as follows:

"Q. Did you know what you signed when you signed the amended certificate of location? A. I suppose I did, or I would not have signed it. Q. You signed two, didn't you—two certificates of location—the first for Mr. Oddie, and another one sent you by Mr. Gayhart? A. Yes, sir; I think I did. Q. Now, then, did you read it? A. Yes, sir; I certainly did, or I would not have signed it? Q. Did you read in that that your north line was where the south line or the south side center of the Valley View was—the south side center monument intersected? A. I don't remember whether I did or not. I don't remember about that. Q. Now, what did Mr. Gayhart say to you? Tell the court a single thing that he said to you during that survey of the Wandering Boy claim. A. Mr. Gayhart and I had but very few words. Q. Well, what did he say? A. That I could not tell you. * * * Q. Did you know where the southwest corner of the Valley View was? A. Yes, sir. Q. Did you know where the south side center was? A. I could not tell you. I could not say that I did. * * * I seen a monument there. I could not say whether it was the Valley View monument or another monument. I don't know. Q. Did you, know where the southeast corner of the Valley View was? A. Yes, sir. Q. You knew, did you not, that there was a certain amount of that claim which was within the Valley View ground that you didn't claim? A. I certainly did. Q. And you never did claim it? A. No, sir. Q. And you didn't claim it up to the time you sold to these people? A. A certain piece we don't claim, and didn't claim at the time we sold it. Q. Did you explain to the gentlemen to whom you sold it that that portion of the ground was within the Valley View ground? A. Yes. * * * Q. Mr. Oddie wanted the claim surveyed for the purpose of establishing the lines between the two claims, didn't he? A. He advised me to have the claims surveyed. Q. You knew they had had their claim surveyed, didn't you? A. Yes. * * * Q. You say you knew where the southeast corner of the Valley View claim was. That was the monument that has been testified to, of earth, and a nail keg in it? (At the S. E. corner of the Valley View, as surveyed by Gayhart.) * * * A. Yes, sir. * * * Q. Didn't you and Mr. Gayhart have a conversation about that particular monument, with the nail keg in it? A. I did not. Q. And didn't he tell you that that was a monument which was established as the southeast corner of the Valley View? A. No, sir; he did not. * * * Q. Can you tell the court a single thing that he did speak to you about? A. No, sir; I cannot. * * * Q. The only thing you can tell the court is that he didn't say anything to you about the monuments? A. He did not."

Mr. Thomas F. Egan, the mining recorder, called on behalf of the defendant, testified that he advised the Cliffords to have the Wandering Boy surveyed; that during the time of the survey made by Gayhart he heard conversations between Gayhart and Edward Clifford, Sr., "in relation to the lines or monuments of that survey"; that there was something said about the boundary of the Valley View claim, "but I could not exactly state what it was. I know they had a talk about it."

In arriving at the proper interpretation and effect of the testimony of the respective witnesses, it will, for the purpose of this opinion, be conceded, as a legal proposition, that the Cliffords, at the time of the location of the Wandering Boy, might have taken up and located all the ground in dispute, situate south of the straight dark line drawn by Mr. Brooks as the legal south line of the Valley View, but the court must decide the case upon the facts. It matters not what might have been done. The question is, what was done? And from the acts performed by the parties the court must determine the legal effect thereof.

The weight of the testimony establishes the fact that the location of the Valley View was prior to that of the Wandering Boy; that, at the time of the location of the Wandering Boy, the locators thereof recognized the prior right of the Valley View, and did not intend to interfere therewith; that they intended that their northern or northwestern boundary should be on the southerly side line of the Valley View. They knew where the stakes and monuments of the Valley View at the southwest and southeast corners were, and they also knew where the south side center monument was placed. They ran their northerly or northwesterly end line over a portion of the Valley View location for the purpose of making their location conform to the laws of the United States, which they had the right to do (Del Monte M. & M. Co. v. Last Chance, 171 U. S. 55, 83, 18 Sup. Ct. 895, 43 L. Ed. 72), and with the declared intention not to claim any portion of the ground embraced in their location, which was north of the south side line of the Valley View ground. When the owners of the Butler group of mines concluded that they had better have their claims surveyed, and boundaries made more certain and definite, the locators of the Wandering Boy soon followed their example, employed the same surveyor, and pointed out to him their original temporary monuments, and lines of their location, and at the time of such survey recognized the south side line of the Valley View mining claim as then marked on the ground by the monuments and stakes at the northeast corner, at the south side center and at the southeast corner of the Valley View, as shown by the Gayhart survey.

On August 1, 1901, the Cliffords conveyed by deed their right, title, and interest in the Wandering Boy, as well as in the Lucky Jim and Stone Cabin, to W. H. Dickson and A. C. Ellis, and on May 5, 1902, Dickson and Ellis conveyed the same to the complainant herein. The complainant, after it acquired this title, having discovered that the original location of the Valley View covered more than 300 feet in a southerly direction from the original point of the location on the easterly end line of the Valley View, marked on the diagram "V. V. Orig. Disc. Mt.," conceived the idea that the Valley View could not claim any more than 300 feet south of the discovery point, and for that reason the locators of the Wandering Boy, having marked its lines over the Valley View ground, could hold all that portion marked in yellow on the diagram, within its side and end lines south of the dark line on the diagram, which marks a point on the southeast corner of the Valley View 300 feet south of the discovery point on the easterly end line of the Valley View, and claimed that the Cliffords, when they recognized the south line of the Valley View, were not aware that the

east end line of the Valley View had been dropped down, and therefore could not be bound by the line thereof, as surveyed by Gayhart. It is sought in this case, as in No. 734, to hold the Valley View to its original notice, and to ignore its rights to change its boundaries without interfering with the rights of others. The Cliffords, prior to the time of their disposing of their interest, fixed the northerly line of the Wandering Boy on the southerly line of the Valley View after the Valley View end line had been dropped down by the Gayhart survey on the Valley View, and must, in equity, be bound by it. It is always competent for the owners of adjoining mining claims to adopt the line established by a prior survey as their boundary or division line, and when such line is adopted and agreed to by unequivocal acts from which an agreement may be clearly implied, whether it is the correct one or not, they will be conclusively bound by it. Such agreement is not within the statute of frauds. Cutler v. Callison, 72 Ill. 113, 115; Bloomington v. Cemetery Ass'n, 126 Ill. 221, 226, 18 N. E. 298; Boyd v. Graves, 4 Wheat. 513, 517, 4 L. Ed. 628; Hagey v. Detweiler, 35 Pa. 409, 412; Dudley v. Elkins, 39 N. H. 78, 84; Coleman v. Smith, 55 Tex. 254, 259; Levy v. Maddox, 81 Tex. 210, 16 S. W. 877; Bailey v. Baker, 4 Tex. Civ. App. 395, 23 S. W. 454; Barnes v. Allison, 166 Mo. 96, 104, 65 S. W. 781; 4 Am. & Eng. Ency. Law (2d Ed.) p. 862, and authorities there cited. The grantees of the Cliffords could not, by any theory known to the law, acquire any further rights than the Cliffords possessed at the time they conveyed their title.

My conclusion is that the evidence in this case, when carefully examined, considered, and weighed, establishes the fact that defendant has the better right to the ground in controversy. Let a decree be entered in its favor, including costs.