## SWEIGART *v.* RICHARDS.

A survey was made under a warrant in 1775, three lines of which were found to have been marked on the ground in that year. The fourth line was shown to have been marked in 1795. To establish that as the true line against subsequent warrantees, it is competent to show that the surveyor who marked both lines received a number of surveys which he located in the neighbourhood in 1795: and his field-notes of those surveys, though not relating to the land in question, and a connected draft made by him, found in the possession of his family and authenticated, showing that the fourth line above mentioned was resurveyed and marked on the land in 1795, are evidence to go to the jury to show the true line of the survey in 1775.

To prove the handwriting of a person who had been dead upwards of forty years, witnesses may speak from a comparison with signatures and writings in family records, admitted by the family to be in such person's handwriting; from letters in the possession of his family purporting to be signed by him; and from official documents received in the proper office, and acted upon as genuine.

IN error from the Common Pleas of Dauphin county.

This was an ejectment to recover about forty acres of land which the plaintiff, Richards, alleged was included within the lines of a survey made on his ancestor's warrant; and the main question was on the admission of certain evidence to establish the existence of the lines marked on the land. The plaintiff claimed under a warrant issued in 1774, and surveyed by Galbraith, and returned in 1775. At the same time two tracts adjoining on either side were surveyed and returned. The northern, eastern, and western lines were found marked on the land, but the southern corners of the adjoining tracts were twenty perches further to the south than a measurement by the draft returned would allow. Between these two corners a line was discovered partially marked (the land having been chiefly cleared), which counted back to 1795, and which the plaintiff contended was his southern line. The plaintiff had a patent issued in 1815.

The defendant claimed under a warrant in 1814, surveyed in 1818, for the tract adjoining plaintiff's to the south; but he alleged that his northern line was forty perches to the north of the line claimed by plaintiff as the division-line. It appeared that some time before 1795, one hundred and thirty-one warrants were delivered to Galbraith, deputy-surveyor, to survey. Of these, one hundred and thirteen had been surveyed and returned, which, in connexion with the evidence subsequently mentioned, showed that the southern line of the Richards and the two adjoining tracts, as now claimed by the plaintiff, had been laid down by Galbraith as

the boundary of those tracts. And the plaintiff offered to read the field-notes of Galbraith made at the survey in 1795, and a con-. nected draft of the tracts then surveyed, to show that this boundary was surveyed and marked by him at that time as the boundary between the Richards tract and the tracts he then surveyed to the south of that. The admission of this evidence was the question. Carpenter, the great-grandson of Galbraith, said that he believed the field-notes to be in the handwriting of Galbraith (who died before the birth of witness), from comparison with entries in the family Bible, admitted to be his by all the family, and letters from him in possession of the family; that he received the field-notes and draft from Mr. Fisher four years before. Mr. Fisher said he received them in 1830 or thereabouts; that he was counsel for the heirs of .Galbraith, and the notes and draft were used as evidence in a controversy between them and one Elder, before the board of property. Rehrer said he had been employed in the land-office for fifteen years, and, judging from the returns to warrants made by Galbraith, these papers were in his handwriting; that warrants for one hundred and eighteen of the tracts upon the connected draft were filed in the office. Col. Crain said he had been forty years in the land-office; that he had never seen Galbraith write, but judging from returns in the office and letters from him, he believed the papers were in his handwriting.

The defendant objected to the warrants for the tracts, contained in the connected draft, because they did not apply to the land in question; and to the field-notes and draft, because they were not official, but found in the possession of individuals, and not in the offices, and had never been returned to the land-office. The court permitted them to be read to the jury.

It was proved that there was a line marked in 1813, which the defendant contended was the true boundary-line; and this question was left to the jury on the evidence.

There was also evidence that plaintiff had pointed out to various persons the line now set up by defendant as his southern boundary; but there was no evidence of his having done so to defendant, before his purchase, or that he purchased on the faith of those representations. The court said this fact alone would not conclude him.

Another point was made, which was answered affirmatively; the facts, however, being left to the jury.

*Alricks*, for plaintiff in error, on the admission of the evidence

cited: 3 Yeates, 587; 6 S. & R. 221; 14 Ib. 372; 8 Ib. 392; 4 W. 247, 264; 1 Penn. Rep. 74; 2 Ib. 384; 5 W. 223, 524; 1 W. & S. 166; 5 Barr, 77; 4 W. & S. 348; 13 S. & R. 123; 6 Binn. 39; 4 W. & S. 323; 4 W. 263.

*Fisher*, contrà: 5 W. 209; 8 Ib. 81, 103; 7 W. & S. 458; 2 Rawle, 141; 7 S. & R. 312; 3 W. 466; 7 Ib. 91; 1 W. & S. 6; 7 W. 91; 1 W. & S. 168; 4 S. & R. 62; 2 Binn. 169; 5 S. & R. 215; 4 W. 261; 13 S. & R. 113; 2 Barr, 43.

*July* 3.   COULTER, J.—The first error assigned is in admitting the evidence contained in defendant's bill of exceptions. The evidence is a connected draft of a number of surveys, purporting to have been made by Bartram Galbraith, deputy-surveyor of the district, and the field-notes of the said surveys, and a large number of warrants on which the surveys were made.

It was proved that these field-notes and the draft had been produced before the board of property, as evidence in a controversy between the heirs of Galbraith and Thomas Elder, and afterwards returned to Adams Fisher, Esq., counsel for Galbraith's heirs, and by him delivered to James C. Carpenter, grandson of Galbraith, who was examined as a witness in the cause. Other testimony, given to prepare the way for the introduction of these papers as evidence, which is on the record, will, I presume, be fully set out by the reporter.

The draft, field-notes, and accompanying warrants, were offered in evidence, for the purpose of showing the southern boundary of the Rittenhouse, Richards, and Bull tracts; under one of which— the Aquila Richards tract—the plaintiff claims. The evidence was objected to, because the draft and field-notes were not sufficiently proved, and because the warrants did not apply to the land in dispute. It is necessary to observe, before considering the objection, that a survey was made on the Aquila Richards warrant, in 1774, and returned into the land-office in the same year, and a patent granted by the commonwealth to the plaintiff, for the same land, on the 24th July, 1815. The dispute, in this case, arises out of the uncertainty of the southern boundary of this tract, and will be determined by the true and accurate location of that boundary. The *title* to lands cannot be acquired or established by unofficial diagrams, drafts, or surveys. But such papers may often be extremely useful in fixing and designating doubtful boundaries. It has been an ancient custom of the courts to receive

them in evidence for what they are worth, in illustrating a question of boundary. Thus, in the case of McCormick *v.* McMurtrie, 4 Watts, 192, it was ruled, that the field-notes and other official proceedings of a deputy-surveyor may always be given in evidence, to explain his acts; and in the case of Nieman *v.* Ward, 1 W. & S. 82, it was ruled that reputation and hearsay is such evidence as is entitled to respect, in a question of boundary, where the lapse of time is so great as to render it difficult to prove the original landmarks.    In Payne *v.* Croft, 7 W. & S., it was decided that the field-notes of a deputy-surveyor were competent as evidence of boundary, and also that a connected draft, certified from the land-office, was competent evidence for the same purpose.    A connected draft from the land-office is usually the work of a clerk, and derives all its value from the juxtaposition of the different surveys.    But the same work done by the original surveyor, if genuine, would seem to be a surer and more perfect guide as to boundary.    Were, then, these field-notes and this connected draft the veritable work of Bartram Galbraith, the deputy who made the surveys, and returned the survey under which the plaintiff claims?    The papers have been produced here in court, and wear on their face the strongest appearance of authenticity and antiquity.    They are covered with the rust of time, and are written in the strong, legible chirography which distinguished public surveyors and other public officers seventy years ago.

James C. Carpenter, the grandson of Bartram Galbraith, in whose possession these papers were, states that his grandfather died in 1804, from which the difficulty of obtaining the testimony of persons who have seen him write, will be at once perceived.    But the witness, Carpenter, swears with undoubting confidence, that the field-notes and the draft with it, writing and figures, are the proper handwriting of Bartram Galbraith, the deputy-surveyor. He says he knows it from his writing in the family Bible, which is the family record, and which all his descendants regard as his genuine writing, and from many letters in the possession of his mother, written by Bartram Galbraith, her father.    It is true that this court have decided that the witness who testifies from a comparison of handwriting must have the highest evidence of the authenticity of the standard paper, which would usually be that of some person who had seen the person write it, *or evidence of equal authority*.    Now it appears to me that the family record, admitted and received by all the descendants as his genuine handwriting, is of as high authority and verity as a standard or test, as the evi-

dence of a person would be who testified to the standard paper from having seen it written. In addition to this, there is the evidence of Richard M. Crain, who has been in the land-office for forty years, and who, from having seen the rĕturns of surveys of Bartram Galbraith, and his letters, all which are recorded at the capitol, and the foundation and evidence of numerous titles received and accepted in the land-office as his genuine writing, testifies to his belief that the field-notes and draft are in the proper handwriting of said Galbraith. And also the testimony of Thos. J. Rehrer, who has been in the land-office for a long time, to the same effect.

In the judgment of this court, the papers were sufficiently authenticated to go to the jury as evidence on the question of boundary. The applicability of the warrants, and their juxtaposition to the land in dispute, was a matter of fact to be determined by the jury from the evidence, and not a matter of law to be ruled in the first instance by the court. They were also competent evidence for the same purpose, connected with the field-notes and drafts of Galbraith, who made the surveys.

The lines run and marked on the ground are the true survey; and although all the lines may not be found on the land, yet if the body of the lines are there, corresponding in data with the survey returned, the survey is valid, and authorizes a presumption that the other lines were actually run and marked, but have been effaced by time or tempest. But still more strongly are those lines good, if they have been resurveyed and marked before any intervening right accrues, which was done in the case in hand. The testimony fully proves that the survey made by Galbraith on the warrant under which the plaintiff claims, was made in 1774, and returned into the land-office, and is well marked round a considerable portion of the tract. But lines of that date are not found on the southern side, where the dispute about the boundary occurs. It appears, from the evidence, that a number of warrants were put into the hands of Galbraith in 1775, upon which he made surveys in that year, and above one hundred of these surveys are regularly returned into the land-office. Adopting the exact distance returned in the survey of 1774, the southern boundary of the tract in question would be near where the defendants below allege it to be, but where no marks are found on the ground, except those made by direction of the defendants, between twenty and thirty years since. It is this circumstance which gives the field-notes and draft importance in the cause. In 1795, Galbraith, the same surveyor who made the survey

of 1774, in making the surveys on the warrants put into his hands in 1795, conformed to the southern line of the tract in question, as we may presume he had run it in 1774, and then re-marked the line, which marks are still on the ground, although those of 1774 on that line have not been found. These marks were not discovered by the surveyor who made the survey under which the defendant claims. In 1815 or 1816, the mode he adopted to fix the southern boundary of the survey in question, on Galbraith's survey, was to run the exact length of the lines from the north, and allowing two perches over, fixed *there* the line under which the defendant claims, and which he alleges is the true southern boundary of the Richards tract. The return of survey of 1774 and the patent corresponds, in course and distance of the southern boundary, with the survey made by Galbraith in 1795. And the returned survey and patent correspond with the Galbraith south line, as found marked on the ground, with this exception, that the distances in some of the lines leading down to this southern or black line, as it has been called, require to be lengthened beyond the perches mentioned in the patent. But this is a circumstance so common in the early surveys, as to be of itself of small moment. The purchaser of land from the commonwealth, is bound to take notice of the lines on the ground, because they are the true survey.

There is not much force in the argument ingeniously urged by the counsel for the plaintiff in error, that the field-notes and draft of Galbraith were not returned to the land-office so as to affect purchasers from the state with notice. But if two or more witnesses belonging to the ancient days of the commonwealth had been found who were present at the survey of 1774, and testified that they saw Galbraith run the southern boundary of the tract, and testified to its location, by marked trees or stones, which time had obliterated, that evidence would not be of record, yet who could doubt its competency as evidence of boundary?

The court correctly instructed the jury that the true evidence of the boundary of the land was the survey made on the ground; and as affording some evidence, at least, of where that boundary as surveyed by Galbraith in 1774 was, the papers were properly received in evidence and commented on by the court.

The fifth and sixth points of the defendant below, relate to a different aspect of the case, the answers to which are assigned as error.

Several of the witnesses testified that the plaintiff Richards had stated to them, that when he first went on the land, he thought the

line marked by the survey of the defendant below, in 1816, was his southern line, but he did not know where the true line was. The court were requested to charge the jury that they could not go over that line, but must consider it admitted as the true line.

If two persons whose surveys adjoin, dispute about the true boundary between them, but in order to settle the controversy agree upon a line, and mark it as the boundary between them, and take possession accordingly, such line would be good and valid though established by parol. But nothing of that kind existed in this case. The mere declarations of an individual, who professed to be uninformed on the subject, that he believed the line to be at such a place, were of no moment, unless it had been shown that the defendant, in consequence of these declarations, and relying upon them, had purchased the land in dispute. In such category they would require a more particular consideration.

In answer to the defendant's sixth point, the court charged the jury, that if the facts were as assumed in it, they instructed them that it was true, and they answered affirmatively. But the court tell the jury that they must take the whole evidence into consideration, and pointed their attention to various facts and circumstances in the testimony; and formally state the law correctly on this point, as follows: "If, however, you are satisfied from the evidence that the plaintiffs encouraged them (the defendants) to expend their labour on this land, as contended for by defendants, then to that extent (the extent of the land cleared in the Galbraith line), the plaintiffs are precluded from recovering."

We perceive no error in the record prejudicial to the plaintiff in error.

Judgment affirmed.