**DUTCH CORNER HISTORICAL SOCIETY, Estate of Joseph W. Imler, Jr. and Mr. and Mrs. Neal Buterbaugh, Petitioners**

v.

**Allen K. STAHL, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 12, 2012.

Decided Oct. 4, 2013.

Reargument Denied Dec. 3, 2013.

Bradley S. Tupi, Pittsburgh, for petitioners.

David J. Flower, Somerset, for respondent.

BEFORE: PELLEGRINI, President Judge, McGINLEY, Judge, COHN JUBELIRER, Judge, SIMPSON, Judge, BROBSON, Judge, McCULLOUGH, Judge and COVEY, Judge.

OPINION BY President Judge PELLEGRINI.[1]

Dutch Corner Historical Society (Society), Estate of Joseph W. Imler, Jr. (Estate), and Neal and Linda Buterbaugh (Buterbaughs), (collectively, Petitioners), appeal from the Pennsylvania Board of Property's (Board) order dismissing their caveats[2] to the two patent applications filed by Allen K. Stahl under the statute commonly known as the Public Lands Act (Act), 68 Pa.C.S. §§ 6101–6114.[3] We reverse.

By the Royal Charter of March 4, 1681, King Charles II of England granted "William Penn, his heirs and assigns . . . make, create and constitute the true and absolute proprietaries of the Contrey [Pennsylvania]" conveying to him "an immediate and absolute estate in fee to the province of Pennsylvania." *Thompson v. Johnston,* 6 Binn. 68, 70 (Pa.1813) Throughout the proprietorship, lands were conveyed by warrant[4] and patent by the Land Office which has operated continuously since William Penn arrived in Pennsylvania in 1682 and began to administer and sell land.[5] In 1779, the Commonwealth bought out the proprietorship and assumed title to all public land not yet conveyed.[6] The Land Office has been housed in various departments of the Commonwealth over its history. In 1981, the land records and the functions of the office, which had been in the Department of Community Affairs, were transferred to the Pennsylvania Historical and Museum

---

1. This opinion was reassigned to the authoring judge on September 10, 2013.

2. A caveat is a formal notice of an unregistered interest in land. *Black's Law Dictionary* 252 (9th ed. 2009). A patent is an instrument by which the government conveys a grant of public land to a private person. *Id.* at 1234.

3. Section 6113 of the Act provides, in pertinent part, that "[a] person with a claim on land for which a warrant application has been made under this chapter may file a caveat . . .," and "[a] caveat must be filed prior to the granting of the patent. No caveat shall be recognized for land after the patent of the Commonwealth has been granted for the land." 68 Pa.C.S. § 6113(a), (c).

4. A land warrant is "[a] document entitling a person to receive from the government a certain amount of land by following prescribed legal steps." *Black's Law Dictionary* 956 (9th ed. 2009).

5. *See* Section 2 of the Act of April 9, 1781, 1 Sm.L. 529, 71 P.S. § 917 ("That an office be, and it is hereby erected, constituted and appointed, . . . and that into the said office shall be removed and safely kept all the records and papers of the former land office or board of property, in the hands, custody or possession of the late secretary, surveyor general, receiver general, or of any other person or persons entrusted with the care or management thereof, by or under the late proprietaries of the province of Pennsylvania, or of their governors or lieutenant or deputy governors; and all future grants and confirmations of land shall issue from the said office, in manner and form herein mentioned."); Section 2 of the Act of March 29, 1809, P.L. 122, 71 P.S. § 922 ("All the books, papers, and other documents in the receiver general's office, and all the patent books, records and documents relating to the titles of lands which are in the rolls' office, shall be delivered to the secretary of the land office, and be by him deposited in his office.").

6. Sections 5–11 of the Act of November 27, 1779, 1 Sm.L. 479, 64 P.S. §§ 1–7; Section 11 of the Act of April 9, 1781, 1 Sm.L. 529, 64 P.S. § 39; *Wallace v. Harmstad,* 44 Pa. 492, 500–01 (1863).

Commission (Commission).[7] Among other duties, the Commission has the duty to maintain and preserve papers relating to the surveys of this Commonwealth, reports of commissioners relating to the boundary lines of this Commonwealth, and maps and other papers lodged with the Land Office. 68 Pa.C.S. § 6102. Commonwealth land records only document transactions between the Penns or the post-revolutionary Commonwealth and the first purchaser(s) of each tract of land.

A person may apply for a warrant to have a survey made of any tract of vacant or unappropriated land. 68 Pa.C.S. § 6103. Land is "unappropriated" when no patent has been issued by the Commonwealth. 68 Pa.C.S. § 6101. Land is "vacant" to which no office rights are outstanding. *Id.* The Department of Conservation and Natural Resources (DCNR), with the cooperation of the Commission, is to determine whether office rights have been granted for a tract of land and whether the tract of land is vacant or unappropriated once an applicant makes a proper application. 68 Pa.C.S. § 6103(c). The applicant is required to give 30 days' notice of the application in a "publication

once a week for three successive weeks in a newspaper of general circulation in the area where the land is situate...." 68 Pa.C.S. § 6103(c)(2).

On April 2, 2008, Stahl filed two patent applications with the DCNR for vacant and unimproved land at the summit of Evitts Mountain in Bedford County. The first application involved 57.44 acres of land in South Woodbury Township on the east side of Evitts Mountain based on the Kochendarfer and Brumbaugh Warrant of 1851. The second application was for 75.18 acres of adjoining land in Bedford and South Woodbury Townships on the east and west sides of Evitts Mountain.

On December 18, 2009, Buterbaughs, who own land on the southwestern side of Evitts Mountain from the Ross Warrant of 1794, filed a *pro se* caveat asserting that Stahl did not follow warrant and patent procedures under the Act, and that Stahl had rebuffed their attempts to resolve the dispute. On March 23, 2010, the Buterbaughs and the Society filed an amendment to the caveat asserting the Society's interest as the grantee of an easement from the Buterbaughs, and that the Buterbaughs owned and improved[8] just over

---

**7.** *See* Section 1203(a) of the Administrative Code of 1929 (Administrative Code), Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. § 333(a) ("The Department of Community Affairs shall have the power, and its duty shall be ... [t]o act as the Land Office of the Commonwealth."); Section 1 of the Act of April 4, 1919, P.L. 44, as amended, 71 P.S. § 908 ("The Secretary of Community Affairs is hereby made the custodian of all deeds, contracts, maps, surveys, ... abstracts of title, and other documents or instruments relating to the titles to real estate owned or hereafter to be acquired by the Commonwealth."); Section 1 of Reorganization Plan No. 2 of 1981—Pennsylvania Historical and Museum Commission—Transfer of powers and duties, Act of March 24, 1981, P.L. 608, 71 P.S. § 751–29 ("The functions, powers and duties of the Secretary of Community Affairs and the Bureau of Land Records with regard to the

custody and care of deeds and other instruments relating to the titles to real estate of the Commonwealth ... are hereby transferred to the [Commission]."); *see also* Section 902 of the Community and Economic Development Enhancement Act, Act of June 27, 1996, P.L. 403, 71 P.S. § 1709.902 ("The Land Office as provided for in section 1203 of the [Administrative Code] shall hereafter be an administrative entity located in the [Commission].").

**8.** "Unimproved land" is "[l]and which shows no signs of occupancy or cultivation." 68 Pa.C.S. § 6101. In addition, "[a] warrant or other office right shall not issue for public land if ... [s]ettlement has been made on the land[, t]he land is totally or partially cleared and fenced [, or t]he land is otherwise improved, used or occupied and held by defined boundaries...." 68 Pa.C.S. § 6112(a).

two acres of the lands claimed in the applications. On April 16, 2010, the Estate and the Society filed a caveat contesting the claim that the other parcel was vacant and unappropriated by chain of title and survey. They also alleged that the Estate's property, from the McCurdy and Cisna Warrants of 1794, adjoins the Buterbaughs' property from the northeast side and across the summit of Evitts Mountain. The Estate's land is bounded on the boundary of the Cisna, McCurdy and Adair Warrants.

On September 1, 2010, a DCNR Professional Land Surveyor (PLS) James J. McElwee (PLS McElwee) filed a report with the Board on the applications and caveats, concluding that the vacant lands existed as asserted and that patents should be issued to Stahl.[9] On October 22, 2011, the Board notified Petitioners of PLS McElwee's report and Petitioners requested a hearing.

At the hearing, Mr. Buterbaugh testified that he bought a 50 to 56–acre parcel on the western side of Evitts Mountain in 1994 and informally surveyed the property himself. Mr. Buterbaugh said that Ken Schulze (PLS Schulze) surveyed the property for him in 2007 and 2008, and located 2.03 acres of vacant land, and that he put up barricades, a tree stand and "no trespassing" signs on that land. He testified that his family have hunted and ridden horses on the 2.03 acres since he purchased the property in 1994.

The Estate's administrator, Joseph Imler, testified that his parents lived on the property for 64 years and told him that their property went over Evitts Mountain, onto the other side, and bordered the Buterbaughs' property. He stated that the Imler family used the land on the summit for hunting, horseback riding and hiking, but did not erect any fencing or other markings to define the property boundaries.

Laura Jackson, who works with the Society, testified that Dutch Corner is a designated rural historic district with many trails on either side of Evitts Mountain, many of which were preserved. She stated that Stahl's proposed use of the land as a wind energy project would make the area unavailable for public use.

PLS McElwee testified that a connected warrant map had to be constructed because one was not available for this area, and that he reached his conclusions that vacant land existed based on this map. He said that none of the connected warrants for the Estate's or Buterbaughs' property reference the top or summit of Evitts Mountain so neither the Estate property nor the Ross Warrant, from which Buterbaughs' land proceeds, go to the top of Evitts Mountain. With respect to the Buterbaughs' property, he stated that while a filler warrant was put in between the Kochendarfer and Brumbaugh Warrants and the King Warrant of 1794, the source of Stahl's adjoining parcel, the Ross Warrant and not the Kochendarfer and Brumbaugh Warrants, was the source of the Buterbaughs' title and the Ross Warrant does not go to the top of Evitts Mountain. He stated that he disagreed with Norman Van Why's (PLS Van Why)

9. *See* Section 6104 of the Act, 68 Pa.C.S. § 6104, which states:
    (a) **Total.**—If the department determines that the land applied for is not vacant or unappropriated, it shall file its report.
    (b) **Partial.**—If the report discloses that a part only of the land applied for is not vacant or unappropriated, the applicant may proceed with respect to the balance under section 6106 (relating to State forests).
    (c) **Appeal.**—The report shall be conclusive upon the applicant, subject to the right of the applicant to appeal to the board within 30 days under regulations of the board.

reliance on John Fluck's (Fluck) 1886 resurvey of John Bennett's official 1831 boundary that extends the Ross Warrant line by 27 rods[10] to the east.

PLS Schulze testified that Stahl and his father contacted him to resurvey their property and he found vacant property on the top of Evitts Mountain. He said that he created a connected draft of the area, admitted as Exhibit 46 (*see* Reproduced Record (R.R.) at 444a), while preparing Stahl's applications for the warrant and patent showing the unclaimed areas alleged in the applications. He stated that he also discredited the evidence and findings of Fluck's resurvey extending the Ross Warrant line by 27 rods.

Through PLS Van Why, Petitioners introduced a number of exhibits composed of surveys and title documents of other owners in the area. He testified that he believes that the Ross Warrant's line should extend to adjoin the Garretson Warrant of 1867 to comply with Fluck's resurvey thereby extending the Ross Warrant line 27 rods to the east. PLS Van Why identified Exhibit 36, (R.R. at 410a), a recorded connected draft prepared by the Department of Community Affairs in 1979 (1979 Connected Draft) of the Garretson Warrant that follows the Fluck drawing and shows the 27–rod extension of the Ross Warrant. He identified Exhibit 38, (R.R. at 412a–414a), a recorded survey map he created in 1986 for another party also based on the Fluck resurvey of the Garretson Warrant, and Exhibit 41, (*id.* at 415a), a recorded 1910 deed following the Fluck resurvey. Following the hearings, the Board directed the simultaneous filing of briefs and closed the record on July 29, 2011.

On October 17, 2011, the Board issued an adjudication and order disposing of Petitioners' caveats. The Board concluded:

[P]LS Van Why's testimony does not conclusively establish by a preponderance of the evidence that the vacant land claimed by Stahl in his Applications as found by PLS Schulze and as confirmed by PLS McElwee is in fact already owned. Van Why's documentary evidence on this issue is bottomed on a draft resurvey made by a John Fluck in 1886 of the official boundary by John Bennett in 1831. According to the evidence, Fluck's survey was not recorded. There is no evidence of a corrected Warrant having been accepted contemporaneous with Fluck's survey. Both PLS Schulze and PLS McElwee testified that the existence of the Fluck survey did not affect or otherwise alter their opinion.

(R.R. at 53a). The Board also found PLS McElwee's testimony persuasive and accorded great weight to his analysis and conclusions. Specifically, the Board credited his testimony that he was required to create a connected warrant map of the area because none existed, (*id.* at 53a–54a), and his conclusion that "because the lines of the original warrants prevail in a determination of whether vacant lands exist, the [Fluck] resurvey of the Garretson warrant 55 years later could not affect the boundary lines of the 1831 surveys." (*Id.* at 54a.)

The Board also rejected Petitioners' assertions that a patent could not issue under Section 6112 of the Act based on the Buterbaughs' and the Estate's improvement of the land. It also rejected that Stahl's notice of the applications in the *Altoona Mirror* did not meet the requirements of Section 6103(c)(2) of the Act, 68 Pa.C.S. § 6103(c)(2), requiring "publication

---

10. A "rod" is "a linear measure equal to 5.5 yards, 16.5 feet, or 5.03 meters." *Webster's New College Dictionary* 982 (3rd ed. 2008).

In turn, a "perch" is "[o]ne square rod of land." *Id.* at 836.

once a week for three successive weeks in a newspaper of general circulation in the area where the land is situate...." Accordingly, the Board dismissed the caveats and Petitioners appealed to this Court.[11]

██ Petitioners first argue [12] that the Board erred when it found PLS McElwee and PLS Schulze to be more credible and persuasive than PLS Van Why because that finding was based on improper factors both legal and factual.[13] First, they contend that the Board did not give sufficient weight to PLS Van Why's testimony and documentary evidence and improperly found it was not persuasive because it was based on the unrecorded 1886 draft resurvey of John Fluck. (*Id.* at 53a.) We agree. The fact that the resurvey was not recorded has no bearing upon its competence as evidence or the competence of

PLS Van Why's testimony or the other recorded documents that relied upon it: the 1979 Connected Draft, (R.R. at 410a); the 1986 map, (*id.* at 412a); and the 1910 deed, (*id.* at 415a). *See, e.g., Schmitt v. City of Carbondale*, 257 Pa. 451, 455, 101 A. 755, 756 (1917) (holding that a map that was found in a corporation's office, which had conveyed a parcel of land for a public park as shown thereon, was admissible as an ancient document because it was more than 30 years old and appeared to be genuine and had been acted upon by the corporation). Thus, the Board erred as a matter of law in rejecting this evidence on this basis.

██ More importantly, though, we agree with Petitioners that the Board erred in accepting PLS McElwee's assertion that there was unclaimed land because

11. Our review of the Board's order is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law, and whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Northrup v. Pennsylvania Game Commission*, 73 Pa. Cmwlth. 389, 458 A.2d 308, 309 (1983).

12. We consolidate and reorder the claims raised in this appeal in the interest of clarity. Stahl argues that Petitioners have waived the foregoing claims by failing to raise them in their Petition for Review. *See* Pa. R.A.P. 1513(d)(5) ("An appellate jurisdiction petition for review shall contain ... a general statement of the objections to the order or other determination ..."). *See generally United Transportation Union v. Pennsylvania Public Utility Commission*, 68 A.3d 1026, 1042 (Pa. Cmwlth.2013) ("To properly preserve an issue, a petition for review filed pursuant to Pa. R.A.P. 1513(d), requires a general statement of objections and provides the statement of objections 'will be deemed to include every subsidiary question fairly comprised therein.' Issues not raised in the petition for review will not be addressed.") (citations omitted). In their Petition for Review, Petitioners alleged, *inter alia*, that "the [Board] improperly weighed evidence and inappropriately disregarded probative testimony and documentary

evidence ..." and that "the [Board] made provable factual errors in determining this case ... [and] these factual errors go to the heart of the Board's reasoning and are errors objectively provable...." (Petition for Review at 2.) Contrary to Stahl's assertion, Petitioners' specific claims in this appeal were not waived because they are clearly subsumed within the general claims raised in the Petition for Review and are fairly comprised therein.

13. In general, all determinations of witness credibility and evidentiary weight are solely within the province of the Board and it is not this Court's function to judge the weight and credibility of the evidence presented to the Board. *Pennsylvania Game Commission v. K.D. Miller Lumber Company, Inc.*, 654 A.2d 6, 9–10 (Pa.Cmwlth.1994), *appeal denied*, 540 Pa. 643, 659 A.2d 561 (1995). However, where, as here, the Board rejects evidence on an invalid basis or fails to appropriately consider a piece of evidence, appellate review is proper. *See Leon E. Wintermyer, Inc. v. Workers' Compensation Appeal Board (Marlowe)*, 571 Pa. 189, 202–03, 812 A.2d 478, 487 (2002); *Department of Transportation v. Agricultural Lands Condemnation Approval Board*, 5 A.3d 821, 825 n. 3 (Pa.Cmwlth.2010).

no connected draft existed as alleged in Stahl's applications when there was 1979 Connected Draft prepared by the Department of Community Affairs while it was in charge of the Land Office. Not only does the existence of this connected draft lead the Board in making a determination as to the weight of PLS McElwee's testimony, it has a conclusive effect.

The former Section 1 of the Act of June 13, 1907 (1907 Act), P.L. 621, *as amended,* 71 P.S. § 914, repealed by Section 2 of the Act of November 22, 2000, P.L. 652, required the Secretary of Community Affairs "[t]o compile, or cause to be compiled, connected warrantee tract maps of each of the several counties of this Commonwealth, from the records on file in the Department of Community Affairs, showing the outlines of the original surveys, name of warrantees, dates of warrants, dates of surveys, names of patentees, dates of patents, together with such other important details as may appear on the original drafts...." The 1979 Connected Draft was prepared by the Department of Community Affairs and certified by its Secretary as required by the 1907 Act.[14] It is an official document of the Commonwealth.

The purpose behind the preparation of these documents is public acknowledgement as to what property is to settle and what property is vacant and unappropriated so that title can be settled. Because it was prepared by the Department of Community Affairs pursuant to a direct statutory mandate, this official Commonwealth document, recorded and maintained as part of the Commission's Land Office records, is conclusive. *See, e.g., Smucker v. Pennsylvania Railroad Co.,* 188 Pa. 40, 43–45, 41 A. 457, 458 (1898) (holding that in an action involving the Commonwealth's taking of land for a canal, a 60–year old map outlining the boundaries of the taking that was found in the files of the office of public works is conclusive evidence as to the facts set forth therein); *Holmes and Holmes v. Public Service Commission,* 79 Pa.Super. 374, 380 (1922) (holding that a 70–year old map taken from the Commonwealth records and by whose agents it was made while in the line of public duty for the public taking of property was not only admissible into evidence, but was conclusive as to the matters covered by it.) Because the 1979 Connected Draft is conclusive as to whether there is any vacant land as alleged, the Board erred in giving any weight to the competing connected drafts. To hold otherwise would mean that governmental records meant to settle things would not do so because they could always be collaterally attacked.[15]

14. Specifically, the 1979 Connected Draft was certified by the Secretary as follows:

> *A CONNECTED DRAFT:* of forty eight (48) tracts of land, which when surveyed, were situate as follows: forty two (42) in Bedford Township, Bedford County; three (3) in Juniata Township, Bedford County; two (2) in South Woodbury Township, Bedford County; and one (1) in Snake Spring Township, Bedford County. The draft has been constructed from and compared with original drafts on file in the Bureau of Land Records, Department of Community Affairs, Commonwealth of Pennsylvania, under the direction of Edward D. Price, Director.
>
> *IN TESTIMONY WHEREOF:* I have hereunto set my hand and caused the seal of the said Department to be affixed at Harrisburg, Pennsylvania, this thirteenth day of April A.D., one thousand nine hundred and seventy nine.
>     WILLIAM R. DAVIS
>     Secretary of Community Affairs
>     By: /s/ *Karl C. Smith*
>     KARL C. SMITH, Executive Deputy Secretary
>
> (R.R. at 410a.)

15. While the 1979 Connected Draft is conclusive, it was prepared by the Department pursuant to the statutory duty imposed by the 1907 Act; it is also conclusive because it is an ancient document upon which the public relies. *See* 24 P.L.E. Evidence § 241 at 280 (2nd ed. 2007) ("Although a map is not ordi-

The official connected draft completed by the Commonwealth pursuant to its statutory duty conclusively establishes that the new claim for vacant land as alleged in the applications does not exist. As a result, the Board's order dismissing Petitioners' caveats must be reversed because the Board erred in rejecting the documents relying on the Fluck resurvey just because it was not recorded, and in failing to accept as conclusive the 1979 Connected Draft showing that the Ross and Garretson Warrants adjoin and that the land sought in Stahl's applications is not vacant.[16]

Accordingly, the Board's order is reversed.

### ORDER

AND NOW, this *4th* day of *October*, 2013, the order of the Pennsylvania Board of Property dated October 17, 2011, at No. BP 2008–0001 is reversed.

### DISSENTING OPINION BY Judge COVEY.

I respectfully dissent from the Majority's holding that the 1979 connected draft prepared by the Department of Community Affairs "**conclusively establishes** that the new claim for vacant land as alleged in the application does not exist." Maj. Op. at 1208 (emphasis added). To the contrary, the Pennsylvania Supreme Court in *Gratz v. Beates*, 45 Pa. 495 (1863) stated: "**Certified connected drafts** of adjoining surveys on file in the land office, are always evidence in this state; **not as the foundation of title, but as aids in locating individual surveys.**" *Id.* (emphasis added).

The Court expressly explained:

So in regard to the relative efficacy of evidence to be drawn from connected drafts and certified single surveys. Both species of drafts were used in this case, on the question of location alone, and both were evidence for that purpose. The learned judge expressed his opinion that the connected draft did not show a location of the Elizabeth Harris warrant on the land in controversy, but referred to the separate drafts as superior evidence in case of a discrepancy between them and the connected draft. This was all he was bound, or had a right to do. **As the first step in showing title, a connected draft is not [conclusive] evidence. Its only purpose is to group together surrounding and adjoining surveys, and by a presentation of the whole ground at one view, enable a court to judge of the location of the particular tract in controversy.**

*Id.* (emphasis added). A connected draft certified by the land office is "**a matter of fact to be determined by the jury [factfinder] from the evidence, and not a matter of law** to be ruled in the first instance by the court." *Sweigart v. Richards*, 8 Pa. 436, 8 Barr. 436 (1848) (emphasis added).

---

narily conclusive as to matters covered by it, [*Fuher v. Westmoreland Coal Co.*, 272 Pa. 14, 116 A. 61 (1922)], it has been held that a map over sixty years old, taken from the records of the Commonwealth is conclusive evidence as to the facts set forth in it. [*Smucker; Holmes.*]"). The 1979 Connected Draft states that the Ross Warrant depicted therein, the warrant at issue in this case, was based on the Ross Warrant of April 10, 1794, the Survey of September 2, 1795, the Resurvey of November 6, 1831, and the Patent of April 23, 1870,

to Daniel Barley *et al.* (R.R. at 410a.). Moreover, the cases cited in the Dissenting Opinion, *Gratz v. Beates*, 45 Pa. 495 (1863) and *Sweigart v. Richards*, 8 Pa. 436 (1848), are distinguishable because they did not involve a certified connected draft created pursuant to such a statutory duty.

16. Based on our disposition of this issue, we will not address Petitioners' remaining claim regarding the adequacy of Stahl's notice under Section 6103(c)(2) of the Act.

Professional land surveyor (PLS) Norman S. Van Why (PLS Van Why) acknowledged that a connected draft or a connected drawing is simply a laying out of "deeds or warrant, patents and start putting them together to show how they adjoin." R.R. at 67a. He described how the connected map is prepared, similar to the Pennsylvania Supreme Court in *Gratz,* as follows:

A connected drawing is when you would take deeds or warrants, patents and start putting them together to show how they adjoin. It will start showing you where you would have gaps, overlaps, vacancies. [sic] This graph will show several of those features. And when the Bureau of Land Records puts these connections together, they always put their sources as to where they found the information in the Bureau of Land Records, the name of the warrant, the acreage, the warrant date, the survey date, the patent date, to whom it was patented, the patent information and if the land has any particular information and/or if the ground or the warrant was not patented.

R.R. at 67a. PLS Kenneth Schulze (PLS Schulze) testified that when a connected drawing is certified "[t]he only thing they're [Land Office] doing is certifying that the information is correct, **not that the positioning of it [deeds, warrants or patents] is correct.**" *Id.* at 104a (emphasis added). As the Pennsylvania Supreme Court in *Sweigart* held, the connected map is **not** conclusive as a matter of law, but only a piece of evidence, the weight of which is to be determined by the factfinder. Department of Conservation and Natural Resources (DCNR) PLS James J. McElwee (PLS McElwee) confirmed that title begins with a warrant, followed by a survey on the warrant, and finally a patent

which establishes that the land no longer belongs to the Commonwealth or a proprietor. *Id.* at 254a. He referred to it as "the patent's completion title." *Id.*

At the crux of this controversy are two competing connected drafts: the 1979 Connected Draft, relied upon by PLS Van Why (Exhibit 36), and the Connected Draft prepared by PLS Schulze in support of the Applications (Exhibit 46). The 1979 Connected Draft depicts the Garretson Warrant and the Ross Warrant as adjoining, thus, showing no vacant land. Whereas, the Schulze Connected Draft shows gaps between the two warrants, thereby, revealing vacant land at the top of Evitts Mountain. The other pertinent difference between the two Connected Drafts is that the 1979 Connected Draft relied upon the unrecorded 1886 draft resurvey of John Fluck (Fluck Survey), Exhibit 42, which according to PLS Van Why extended the Ross Warrant 27 rods.[1] (The survey performed prior to Fluck's Survey was conducted by John Bennett in 1831). PLS Schulze found the Fluck Survey to be contrary to standard professional land surveyor procedures and therefore unreliable. PLS McElwee concurred in PLS Schulze' conclusion. The Fluck Survey deficiencies will be discussed in more detail below.

When PLS Schulze was asked what a significant variance between the Fluck Survey and the Garretson Warrant is, he responded: "The main thing is that [Fluck] is identifying Ross as an ajoinder on that line. If there was a resurvey to be done the Ross [W]arrant is much senior [sic] the Garretson [W]arrant should have joined it." *Id.* at 95a. When asked about Fluck's conclusion that the 1831 survey by Bennett "is 27 rods short", PLS Schulze replied: "If it would have been long I

---

1. A "rod" is "a linear measure equal to 5.5 yards, 16.5 feet, or 5.03 meters." *Webster's New College Dictionary* 982 (3rd ed. 2008).

could have understood. Short doesn't work." *Id.* at 98a. He further explained:

> [T]he surveyor was supposed to have a true bearing and neat measurement, which meant that you did not slope the chain or the—whatever they're using, up the hill. It had to be horizontally plumb. I don't know if they use plumb bobs, but anyway if you slope chain a distance up—and this is all going uphill. And we'll say it's 1,000 feet on an angle like this, so if you come to vertical it may only be 800. So our problem in the past is that if we take 1,000 feet that—they said we don't reshoot everything. So we got—you got to evaluate what type of conditions they were surveying, how accurate was the type of equipment.

*Id.* PLS Schulze further expounded concerning the improbability of the survey being 27 rods short:

> So, you got a new survey coming up out there and we are now running 37 degrees when the original was 42. There's a big deviation and [PLS Van Why] shows himself, I'm starting here, I'm cutting across the vacancy. I'm starting here, I'm cutting across the vacancy (sic) and I'm ending up there, which does not influence our patent or warrant application.

*Id.* at 99a. Correspondingly, when PLS McElwee was asked "[w]hat significance if any, would you attribute to a movement of 27 rods as proposed by [PLS] Van Why?" he responded:

> Well, if I understood it correctly Mr. Fl[u]ck, I guess was saying that he found the distance to be 27 rods too long and I concur with [PLS] Schulze that measuring up the mountainside like that and given that Mr. Bennett had supposedly Mr. Wood's original survey, so he had distances. If you measure 150

perches [2] up a mountainside like this—okay. Take distance 150 and you have a plug here assuming you could, when you lay that down that 150 is going to be more like 130. There is no conceivable way the slope distance can give you a longer course. The only way that they could end up with [sic] actual distance being too long is if they measured way too long.

*Id.* at 107a. PLS McElwee further testified that in the area of Imler's property, none of the warrants go to the top of the mountain. *Id.* at 254a. Similarly, regarding Buterbaughs' property, the source of title is the "William Ross [W]arrant" and the William Ross Warrant does not go to the top of the mountain. *Id.* at 255a.

Notwithstanding the above-cited Pennsylvania Supreme Court cases and testimony, the Majority maintains that the 1979 Connected Draft is conclusive evidence and cites *Smucker v. Pennsylvania Railroad Co.*, 188 Pa. 40, 41 A. 457 (1898) and *Holmes and Holmes v. Public Service Commission*, 79 Pa.Super. 374 (1922), to support its position. However, these cases are clearly distinguishable as they both involved eminent domain. In one case the map was created at or about the time of the taking and, in the other case, the map again was prepared at or about the time of the taking and the reliability of the map was not questioned. The *Smucker* Court expressly found that the map in question "was not a paper between the parties as to boundary, but **a signification by the [C]ommonwealth of the quantity taken** by boundary.... This map **having been made about the time of the appropriation,** and deposited in the proper place, its authenticity could not thereafter be questioned." *Smucker*, Pa. at 44, 41 A. at 458 (emphasis added).

---

**2.** A "perch" is "[o]ne square rod of land." *Webster's New College Dictionary* 836 (3rd ed. 2008).

Similarly, in *Holmes* the plaintiffs were seeking damages from the Pennsylvania Railroad for building an embankment on their property. The railroad submitted a map to show the boundaries based on a drawing of a lock house made at the time the railroad · first acquired the canal in question. The *Holmes* Court held that the map was admissible as an ancient document and conclusive because "[t]he map, made in or about 1848, showed that the lock house abutted on the canal towpath, and it was **unquestioned** that if this was so, the embankment was not on plaintiffs' land, for it did not extend as far south as the lock house foundation. The plaintiffs **admitted** that if the towpath extended to the lock house foundation there was no encroachment upon their land...." *Holmes,* 79 Pa.Super. at 380 (emphasis added). Clearly here, the 1979 Connected Draft is not a signification by the Commonwealth of boundary taken, it was not created contemporaneously with any warrant, and it is not unquestioned. As our Supreme Court has expressly espoused: a connected draft is "**not** [conclusive as] a matter of law to be ruled in the first instance by the court." *Sweigart* (emphasis added). Given the discrepancy between the two connected drawings and the reasons proffered therefor, the 1979 Connected Draft cannot be accepted as conclusive, but rather is "a matter of fact to be determined by the [factfinder] from the evidence." *Id.* A document is only as reliable as the strength of its contents. Where indicia of a document's unreliability are evident from the document and surrounding circumstances, we should decline to find it conclusive as to the matters contained therein.

It was within the Board's sole province to determine the evidentiary weight to be given to each drawing. *Pennsylvania*

*Game Comm'n v. K.D. Miller Lumber Co., Inc.,* 654 A.2d 6 (Pa.Cmwlth.1994). The Board found that the Fluck Survey was not recorded and it discounted PLS Van Why's testimony on that basis, which it had the authority to do. The Majority, however, maintains that the Board did not give sufficient weight to PLS Van Why's testimony and documentary evidence and improperly found it was not persuasive because it was based on the Fluck Survey. Specifically, the Majority opines that "[t]he fact that the resurvey was not recorded has no bearing upon its competence as evidence...." Maj. Op. at 1206. To the contrary, the purpose of recording a survey is to put others on notice. As the Pennsylvania Supreme Court ruled: "What is done by public officers, and recorded in a public office appointed for that purpose, must be considered as known to all persons." *Goddard v. Gloninger,* 5 Watts 209 (Pa.1836). Notably, the Fluck Survey is actually a letter Fluck authored describing the resurvey he conducted. R.R. at 72a. Moreover, Fluck's letter, the only primary source on record, does not include Fluck's original drawing. R.R. at 420a–422a.

> As with other administrative agencies, all determinations of witness credibility and evidentiary weight are solely within the province of the Board. Accordingly, it is not the function of this [C]ourt to judge the weight and credibility of the evidence given before an administrative agency. In deference to the Board, therefore, we will not challenge the Board's assessment of credibility or evidentiary weight....

*Pennsylvania Game Comm'n,* 654 A.2d at 9–10 (citations omitted). Here, the Board concluded:

> [PLS] Van Why's documentary evidence [3] on this issue is bottomed on

---

**3.** PLS Van Why's documentary evidence that

relied on the Fluck Survey consisted of the

draft resurvey made by a John Fluck in 1886 of the official boundary by John Bennett in 1831.... There is no evidence of a corrected Warrant having been accepted contemporaneous with Fluck's [S]urvey....

The original title to all lands in Pennsylvania is the Warrant. Patents granted by the governor and subsequent deeds and other documents of title cannot grant more than the Warrant nor can a subsequent document, except by agreement or compromise, alter it. Fluck's resurvey of the Garretson proposes to change the boundary of senior William Ross and Cissna warrants. No evidence of an agreement or compromise exists in this record. Thus, Fluck's resurvey cannot form the basis for a finding in this case.

The Board finds persuasive PLS McElwee's testimony and the Board accords great weight to his analysis and conclusions.... The Board also agrees with PLS McElwee's conclusion that because the lines of the original warrants prevail in a determination of whether vacant lands exist, the resurvey of the Garretson Warrant 55 years later could not affect the boundary lines of the 1831 surveys.

Board Dec. at 19–20.

PLS Van Why testified regarding the 1979 Connected Draft which was not prepared by him, but another individual. The 1979 Connected Draft relied on the Fluck Survey for only one warrant in question— the Garretson Warrant. *Id.* at 67a. PLS Schulze testified that he created his own connected draft, which was confirmed by PLS McElwee. PLS McElwee evaluated the Applications, prepared a detailed DCNR Report regarding the same and

1979 Connected Draft, the 1986 map and the 1910 deed. Hence, contrary to the Majority's assertion, the Board did state why it rejected the 1979 Connected Draft.

testified to such at length before the Board. *Id.* at 78a–109a, 271a–330a. As the 1979 Connected Draft was not conclusive evidence, and it was within the Board's province to reject the documents relying on the Fluck resurvey, I believe the Board's decision should be affirmed.[4]

Judges SIMPSON and McCULLOUGH join in this dissenting opinion.

**4.** Concerning the other issues Petitioners raised, I agree with the Board and would, therefore, affirm on those grounds as well.