## Hagey *versus* Detweiler.

A deposition is not to be rejected because notice of filing it was not given as required by rule of court, where the objections to it would not have availed had exceptions been taken within the time prescribed.

A boundary line between adjoining owners which can be clearly traced may be altered by the acts or agreements of the parties, and a purchaser from one of them, with notice, will be bound by such consentable line.

The fixing of a boundary line by parol is not within the operation of the statute of frauds; no estate is thereby created; but when the boundary is fixed by the parties, they hold up to it by virtue of their title-deeds, and not by virtue of a parol transfer.

Whenever a verdict in ejectment is sufficiently certain to enable the court to give judgment, and the sheriff to deliver possession, it will be sustained; and this certainty may be in the verdict itself, or by reference to something of a permanent and public nature.

But a verdict, uncertain in itself, is not helped by a reference to a line proved by witnesses on the trial; or by reference to a line, the starting-point of which is not fixed with reasonable certainty; such a verdict is radically defective.

"The middle of a stone wall" is too indefinite a starting point for the boundary of a town lot as fixed by verdict.

ERROR to the Common Pleas of *Northampton county.*

This was an ejectment by William F. Detweiler against Jonas G. Hagey, for a lot of ground in Hellertown, Saucon township, 10 feet in width, by 125 feet in length. The suit was brought in order to fix the boundary between the plaintiff's and defendant's lots.

Both lots were originally part of the same tract; and, in 1821, they were respectively vested in Dr. Henry Detweiler and Isaac McHose, between whom, it was alleged, the boundary claimed by the plaintiff was established by consent. The defendant claimed title under Isaac McHose.

On the trial, the plaintiff offered in evidence a deed to himself from Dr. Henry Detweiler, dated the 12th April 1855, which was objected to by the defendant, because no title had then been shown in Dr. Henry Detweiler; and because the letter F. had been interlined in the name of the plaintiff. The court overruled the objection and sealed a bill of exceptions.

The plaintiff also offered in evidence the deposition of a deceased witness, taken before a justice of the peace, under a rule of court. A witness testified that he gave a copy of the notice of the time and place of taking the deposition to a third person, and accompanied him to the residence of the defendant, more than forty-eight hours before the taking of the deposition, and remained outside whilst the party went in and served the notice. It was also proved, that the defendant acknowledged having received a notice of the taking of the deposition. No notice was given of

[Hagey *v.* Detweiler.]

the filing of this deposition, but it was proved to be in the same condition as when filed, and that the body of it was in the hand-writing of the justice before whom it purported to have been taken. The court overruled an objection to this deposition, and the defendant excepted.

There was evidence tending to prove that in 1826, Dr. Henry Detweiler, who was then the owner of the plaintiff's lot, and Isaac McHose, who was then the owner of the defendant's lot, fixed the boundary between their respective properties, and erected a stone wall on the boundary line, which remained there at the time the defendant purchased in 1841. Soon after his purchase, the defendant, alleging that he had not the full complement of ground called for by his deed, erected a bake-oven which extended beyond the line fixed by Dr. Detweiler and McHose. For the ground so encroached upon, this action was brought.

The defendant's counsel presented certain points in writing, upon which they requested the court to charge the jury, the 6th of which was as follows :—

" That the fixing of a consentable line is revocable, inasmuch as it is in conflict with the statute of frauds, unless it has been mutually acquiesced in for twenty years."

The court below answered this point in the negative, and in their general charge, instructed the jury as follows :—

" The dispute in this case is about a boundary, and, as the counsel have told you, there are three ways of showing boundary : 1. By running it from marks or monuments called for in the deed, and found on the ground. 2. By showing that there has been an adverse possession for twenty-one years up to a certain line or fence, claimed as the boundary. 3. A consentable line, or a line established by the agreement of the adjoining owners.

" As to the first mode of showing the boundary, the defendant says that the line as fixed and established when the defendant's property was cut off from the property north of it, part of which is now owned by the plaintiff, is the true line. This is the true line, if the line has not since been altered by agreement or acquiescence of parties owners. But a boundary line between parties which can be clearly traced, may have been altered by the acts or agreements of the adjoiners; a man is not obliged to build his fence on the line; he may place it within his own line, and he is in constructive possession to the actual boundaries of his land. But the fence may become the line by his suffering his neighbour to take adverse possession up to the fence, and to continue it for twenty-one years. The plaintiff says the old worm fence was the line acquiesced in by the adjoining owners, and that he and those under whom he claims had adverse possession up to the middle of that fence for more than twenty-one years, and the wall was put on the line so claimed. If you believe that this wall was built by

[Hagey *v.* Detweiler.]

an agreement between Dr. Detweiler and McHose, testified to by Dr. Detweiler, Hagey would be bound by it, if he purchased from McHose with notice of it, or what was equivalent to notice. The wall was a visible boundary, and if the doctor was in possession up to the wall when Hagey bought, it was equivalent to notice. It would be taken out of the statute of frauds by giving possession to the doctor by McHose. And it was not necessary that his possession should have been continued twenty-one years before McHose bought."

To this charge the defendant excepted. The jury found the following verdict: "We find for the plaintiff so much of the land claimed in the writ, as lies north of a line, beginning at a point which is thirteen feet south from the middle of the south wall of the late old stone shed, thence a straight line northeasterly direction to post, the south-east corner of plaintiff's lot, with costs of suit." And judgment having been entered on the verdict, the defendant sued out this writ, and here assigned for error: 1. The admission of the evidence mentioned in his bills of exception: 2. The charge of the court to the jury: 3. The uncertainty of the verdict.

*C. & M. Goepp,* for the plaintiff in error, argued that the fixing of a consentable line was within the statute of frauds, and cited Price *v.* Peele, 15 *Johns.* 503; Galbreath *v.* Galbreath, 5 *Watts* 150; Seitzinger *v.* Ridgway, 4 *W. & S.* 488; Gratz *v.* Gratz, 4 *Rawle* 433; Snively *v.* Luce, 1 *Watts* 69; Goucher *v.* Martin, 9 *Id.* 106; Ewing *v.* Tees, 1 *Binn.* 454; and many other cases.

*Maxwell, Reeder & Green,* and *A. E. Brown,* for the defendant in error, to this point, cited Syler *v.* Eckhart, 1 *Binn.* 378; Billington *v.* Welsh, 5 *Id.* 131; Pugh *v.* Good, 3 *W. & S.* 56; Reed *v.* Reed, 2 *Jones* 121; Dixon's Executors *v.* Crist, 17 *S. & R.* 54; Fisher *v.* Larick, 3 *Id.* 319; Chew *v.* Morton, 10 *Watts* 324; Rice *v.* Bixler, 1 *W. & S.* 455.

The opinion of the court was delivered by

WOODWARD, J.—Of the seventeen errors assigned, two relate to bills of exception upon evidence, two to the form of the verdict, and the residue to the charge of the court.

The first of the two relative to evidence we understand to be abandoned in argument. It was well not to press it. The deed was properly admitted, and the alleged interlineations referred, as they belonged, to the jury.

As to the deposition of Jacob Geisenger, we think there was no error in its admission. There was proof before the court of competent notice of the time and place of taking the deposition, and of the due execution and return of the rule by the examining

[Hagey *v.* Detweiler.]

magistrate.  The prothonotary received the deposition and filed it
in the ordinary course of such business; and had he given notice
thereof to counsel, the rule of court would have applied which
requires exceptions to be filed within fifteen days.   For the want
of such notice, that rule does not seem to be applicable; but as
the exceptions now made would not have been available if taken
within the fifteen days, they ought not to deprive the party of the
testimony of a witness who has since died.

The charge of the court seems to have recognised the defend-
ant's positions touching the boundary line as contained in the
title-deeds, but to have left it to the jury to find whether those
under whom the respective parties claimed had not substituted an
agreed or consentable line therefor, and held according to it for
twenty-one years and upwards.   The learned judge said that a
boundary line between parties which can be clearly traced may
have been altered by the acts or agreements of the adjoiners, and
that Hagey would be bound by the wall built by agreement between
Dr. Detweiler and McHose, if he (Hagey) purchased from McHose
with notice of the wall; and as it was a visible boundary, and Dr.
Detweiler was in possession up to it when Hagey bought, the wall,
it was held, was equivalent to notice.

The great objection urged against this ruling is drawn from the
statute of frauds and perjuries.   It is supposed, that boundaries
fixed by parol are within the operation of the statute.   This is a
mistake.   The statute is a rule of conveyance; it requires a
writing to *create* an estate or interest in lands, that shall have
more force or effect than a lease or estate at will only.   But adjoin-
ing owners who adjust their division line by parol, do not create
or convey any estate whatever between themselves; no such
thought or intention influences their conduct; after their bound-
ary is fixed by consent, they hold up to it by virtue of the title-
deeds, and not by virtue of a parol transfer.   Generally, indeed,
they feel that their rights, as defined in the title papers, have
been abridged rather than enlarged by the agreed line; and
this, because their treaty proceeds on the basis that the exact right
between them is doubtful.   Out of the doubtfulness of the right
springs the consideration which binds parties to such agreements.
This is plainly taught in the leading case of Perkins *v.* Gay, 3
*S. & R.* 331.   Surrender is indeed a mode of conveyance, and
though at common law it might be by parol, it is now expressly
within both the English and the Pennsylvania statutes of fraud
and perjuries, except it be a surrender by operation of law, when
the English statute does not embrace it.   But, I repeat, the par-
ties to a consentable line intend no conveyance by surrender or
otherwise.   For the sake of peace and good neighbourhood, they
agree that a doubtful fact shall be ascertained and indicated in a
particular manner; and the practice of this court has been to

[Hagey v. Detweiler.]

encourage such compromises. I do not know that it has ever before been suggested, that the statute of frauds and perjuries stands in the way of such agreements, but whether suggested or not, this court has never so applied the statute.

From the allusion of the learned judge to a boundary line "which can be clearly traced," it might be inferred, that there was no doubt for the treaty of these parties to rest on, and therefore, properly speaking, no consentable line; but that line which can be so clearly traced assumes the white oak post between Dornblazer and Laubach to be the mark called for by the Heller deed and survey, and whether it was that mark or not, the judge referred to the jury. A line which depends on allowances for the variation of the needle, and the position of a post set so long ago as 1784, cannot be considered free from doubt, however traceable by its appropriate course it may be, if the position of the post be assumed. The doubt has reference of course to the starting-point, not to the bearing of the line; but that doubt infects the line from beginning to end. At the place at which this line became a boundary between these parties, or their predecessors in title, it was a fair subject of compromise, and if they fixed it where the worm fence had stood, and where the stone wall was built, the court and jury did right to hold them to it.

The evidence in reference to the agreed line and the possession of the parties was referred to the jury, with instructions in which we see no fault; and all that remains for us to consider is, whether the verdict was such as can sustain the judgment for the plaintiff. It was in these words: "We find for the plaintiff so much of the land claimed in the writ as lies north of a line beginning at a point which is thirteen feet south from the middle of the south wall of the late old stone shed, thence a straight line northeasterly direction to post, the south-east corner of plaintiff's lot."

Objections to the form of verdicts are not to be encouraged. Whenever the verdict is sufficiently certain to enable a court to give judgment and the sheriff to deliver possession, it will not be disturbed; and this certainty may be in the verdict itself, or by a reference to something of a permanent and public nature. The maxim *id certum est, quod certum reddi potest*, applies here. Hence, the award in Santee *v.* Keister, 6 *Binn.* 36, in favour of a plaintiff in ejectment agreeably to the decision of the board of property; and the verdict in Green *v.* Watrous, 17 *S. & R.* 393, for the plaintiff for the whole tract sued for, deducting one hundred acres described in the original agreement, agreeably to an award made by certain referees; and in Tyson *v.* Passmore, 7 *Barr* 273, "for eighty-two and a half acres of land, being the land covered by the warrant of survey of July 1832," were held sufficiently certain. The references in these cases were to public records—fixed and unalterable memorials that were accessible to

[Hagey *v.* Detweiler.]

everybody—and which might be appealed to, therefore, to remedy the intrinsic defect of the verdict as recorded.    But in O'Keson *v.* Silverthorn, 7 *W. & S.* 247, a verdict uncertain in itself was not helped out by a reference to a line " proved by Robert Silverthorn to have been made as a division line of the whole tract, in the spring of the year 1801, by and between Daniel O'Keson and Nicholas O'Keson."    " A reference," said Judge SERGEANT, in that case, " to a matter of record, as a recorded deed, or a diagram found by the jury and filed of record with the verdict, like the draft of a road in the Quarter Sessions, or to natural or artificial boundaries on the ground, might be sufficient; but who can tell how this line is to appear?    Nothing is referred to as showing it to future times; it rests merely on the evanescent oral proof of a witness given during the trial."

The verdict rendered in the case before us, when taken in connection with the description in the writ, would be sufficient to indicate the ground recovered, if the starting-point assumed in the verdict could be fixed with reasonable certainty.

But the sheriff, if he went on the premises with an *habere facias possessionem* in hand, would have no other direction to the starting-point than is contained in the words, " *thirteen feet south from the middle of the south wall of the late old stone shed.*"    This wall is not to be confounded with the wall spoken of in the judge's charge as substituted for the worm fence, but is the wall of an old shed that stood on Detweiler's land, and which is repeatedly referred to by the witnesses, but its dimensions described by none of them.    The old shed is gone, and there is no motive for preserving its foundation wall.    Whilst this wall lasts, it has no public character as a boundary—is mere private property; and when it shall next be sought for to fix the plaintiff's line by, not one stone of it may be found upon another.    Now if a decaying wall of that sort were fit to base a verdict upon, what part of it is to be taken for the execution of this verdict—the middle of its thickness or the middle of its length?

This question derives importance from the consideration that we are dealing with town lots, the boundaries of which are measured by feet and inches, and upon which buildings have been erected that may have to be removed.

The length and thickness of the south wall of the late old stone shed are not stated, but from the diagram before us we would suppose it to be from sixteen to twenty feet in length, and not parallel with the division line which the jury meant to establish between the parties.    At the nearest point, it seems to be four feet ten inches from that line, at the point assumed by the jury thirteen feet, and at the western extremity more than that distance. It is not probable the wall is less than two feet thick.    If the jury meant that their verdict should be measured from the middle

[Hagey *v.* Detweiler.]

of this wall, regard being had to its length, did they mean the face of the wall or the centre line of it? If by middle they meant that centre line, then where, in respect of its length, did they intend to start from? The verdict throws no light on these questions. We see not how the sheriff could decide them. And yet decide them he must, before he could find the line the jury meant to establish.

From the draft before the jury, but which is not made part of their verdict, it would seem most probable, that they referred themselves to the face of the wall at the middle of its length; but on the other hand it is to be remembered that, in surveys generally, a line described as beginning at or running from a particular object, whether a post, a tree, or a stone, is to be measured from the centre of the object—and more certainly so, when not merely the object, but the *middle* of the object is called for.

The vice of this verdict is radical and incurable. The practice of this court favours verdicts, but does not tolerate such essential uncertainty. The verdict cannot be supported upon the adjudged cases. It comes short of the great object of all verdicts, which is to make an end of controversy, and we feel obliged to set it aside.

> The judgment is reversed, and a *venire facias de novo* is awarded.

READ, J., dissented from the ruling in respect to the verdict.