# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Long Run Timber Company,    :
Limited Partnership,    :
            Petitioner    :
   :
            v.    :    No. 2313 C.D. 2015
   :    Argued:  June 6, 2016
Department of Conservation and    :
Natural Resources,    :
            Respondent    :


**BEFORE:**    **HONORABLE RENÉE COHN JUBELIRER,** Judge
                 **HONORABLE MICHAEL H. WOJCIK,** Judge
                 **HONORABLE JAMES GARDNER COLINS,** Senior Judge


**OPINION BY**
**JUDGE COHN JUBELIRER**                  **FILED:  August 30, 2016**


Long Run Timber Company, Limited Partnership (Company) petitions for review of the Order of the State Board of Property (Board) that dismissed Company's Complaint to Quiet Title (Complaint) in which it sought a determination regarding its right, title, and interest in approximately 56.97 acres in Tioga County (Disputed Property).  The Complaint also sought to preclude the Commonwealth of Pennsylvania (Commonwealth), Department of Conservation and Natural Resources (DCNR) from asserting any interest in the Disputed Property.[1]  At issue here is the boundary line between tracts of land known as

---

[1] The Complaint was filed pursuant to Section 1207 of The Administrative Code of 1929, Act of April 9, 1929, P.L. 177, as amended, 71 P.S. § 337.  Section 1207 provides, in pertinent part, that "[t]he Board . . . shall . . . have jurisdiction to hear and determine cases involving the

*(Continued…)*

Warrant 1180, owned by DCNR, and Warrant 1179, owned by Company. Because the Board accepted DCNR's evidence as credible and rejected Company's evidence as not credible, it concluded that the boundary was located where DCNR asserted; Company's action to quiet title therefore failed and so the Board dismissed the Complaint. On appeal, Company argues[2] that: (1) the Board erred in using a natural monument not described in the original patent and artificial monuments associated with a subsequently conveyed property to identify the location of the boundary line of the Disputed Property; (2) the Board's determination of the boundary line between Warrant 1179 and Warrant 1180 is not supported by substantial evidence; and (3) the Board's finding that there was no settlement agreement between the Commonwealth and a prior record owner of Company's property that established a compromised boundary line (Compromise Line) is not supported by substantial evidence. Although we conclude that the Board did not err on the first two issues, we must vacate the Order and remand for further proceedings for the Board to consider Company's parol evidence regarding the existence of a Compromise Line which it did not consider in its initial determination.

## I.  Background

Company filed the Complaint on January 18, 2012, DCNR responded with an Answer with New Matter, and Company filed its answer to the New Matter.

title to land or interest therein brought by persons who claim an interest in the title to lands occupied or claimed by the Commonwealth." Id.

[2] Company raises five separate issues on appeal, which we have consolidated into these three main issues.

Formal hearings were held before the Board in February 2015.[3] At the hearings, Company presented documentary evidence and the testimony of its general partner, Robert Sher, and professional land surveyor K. Robert Cunningham, PLS (P.S. Cunningham), whom Company offered as an expert witness. DCNR presented documentary evidence and its own expert witnesses, Rodger O. Cook, PLS (P.S. Cook) and Justin J. Daubert, PLS (P.S. Daubert). The documentary evidence included the original Patents for Warrant 1179 and Warrant 1180,[4] a current survey by P.S. Cunningham and five historical surveys of Warrant 1179 and Warrant 1180, deeds, current and historic maps, computer-aided design (CAD) calculations and drawings, tax records, photographs, and surveyors' notes. From that evidence, the Board found the following facts.

Warrants were issued to Charles Willing on April 21, 1792 for adjacent, rectangular parcels of land of approximately 1,100 acres each in what became Tioga County. Both Warrant 1179 and Warrant 1180, which share a north/south border, were surveyed by James Ellis (Surveyor Ellis) in June 1793. These surveys (Ellis Surveys) showed that each parcel was "432 perches along the east/west axis and 431 ½ perches along the north/south axis, and the common boundary was

---

[3] At the time of the hearings, the Board consisted of Chairperson Karen L. Cummings, Esq., Christopher C. Houston, Esq., and Gretchen S. Wisehart, Esq. (Final Adjudication at 1.) Following the hearings but prior to deliberation, Mr. Houston was replaced by Arthur F. McNulty, Esq., who became the designee of the Secretary of Community and Economic Development. (Id. at 1 n.1) Following the hearings and the deliberation but prior to the Board making its Final Adjudication, Ms. Wisehart was replaced by Tyrone A. Powell, Esq., who became the designee of the General Counsel. (Id. at 1 n.2.) Both Mr. McNulty and Mr. Powell reviewed the entire record prior to their participation in issuing the Final Adjudication in this matter. (Id. at 1 nn.1-2.)

[4] This Court set forth a detailed history of the use of land patents in Pennsylvania in Dutch Corner Historical Soc'y v. Stahl, 78 A.3d 1201, 1202-03 (Pa. Cmwlth. 2013).

marked by a birch tree to the west and a beech tree to the east."[5] (Final Adjudication, Findings of Fact (FOF) ¶ 4.) In his accompanying drawing, Surveyor Ellis identified "a waterway crossing the western side of Warrant 1179 very close to the northwest corner." (Id. ¶ 5; R.R. at 719a.) The Ellis Surveys were not returned to the land office until March 1806. Mr. Willing transferred Warrant 1179 and Warrant 1180 to William Bingham, who owned significant amounts of surrounding real estate, in July 1793. Mr. Bingham died in 1804, and the Bingham Estate became the common owner of Warrant 1179 and Warrant 1180. (FOF ¶¶ 6-7.) The Bingham Estate received the Patents for Warrant 1179 on May 26, 1806, and for Warrant 1180 on May 26, 1807. The Patent for Warrant 1179 does not reference any waterways in describing the property, but does refer to various trees at the corners of the property, courses from each of those trees, and that Warrant 1179 runs "thence by land of John Barron." (R.R. at 724a.)

The Bingham Estate proceeded to convey various portions of Warrant 1180 and Warrant 1179, including approximately 48.5 acres, identified as Lot 67, to Martin Repherd by deed dated June 1, 1850 (Repherd Tract). (FOF ¶ 8; R.R. at 727a.) Various maps show the Repherd Tract straddling Warrant 1179 and Warrant 1180. (Id. ¶ 29; R.R. at 731a, 760a, 1043a, 1123a, 1125a, 1322a, 1362a, 1366a-67a, 1459a.) Thereafter, on December 28, 1875, the Bingham Estate conveyed land, including the unsold remainder of Warrant 1180, to the Blossburg Coal Company (Blossburg) without performing a survey. (FOF ¶¶ 10-11.) The deed to Blossburg (Blossburg Deed) referenced the Repherd Tract as abutting Warrant 1180's southern border on its eastern and western borders. (Id.; R.R. at

---

[5] A "perch" or "rod" is a linear unit of measure that is equal to 16.5 feet. (Final Adjudication at 2 n.3.)

4

918a.)  Blossburg transferred its interests in Warrant 1179 and Warrant 1180 to the Commonwealth by deed dated November 10, 1954, and recorded November 12, 1954.  (FOF ¶ 12; R.R. at 957a, 965a.)  Prior to the sale, in October 1952, Allen R. Fine, Jr. (Surveyor Fine) surveyed the area at the direction of John C. Rex, P.E. (Fine Survey).  (FOF ¶¶ 13, 16.)  The Fine Survey supports the finding "that the northern edge of the disputed area constitutes the boundary between Warrant 1180 and Warrant 1179, because [Surveyor Fine] found stone piles at the endpoints of this line consistent with the corners of the . . . Repherd [Tract] and property to the east of that lot."  (Id. ¶ 13.)  In particular, Surveyor Fine "found a stone pile marking the northern-western corner of the . . . Repherd [Tract] approximately 50 rods north of a stone pile he found marking the boundary between Warrants 1180 and 1179 [that] abutted against the western side of the . . . Repherd [Tract], and he found a stone pile along that same line at the eastern side of the . . . Repherd [Tract]."  (Id. ¶ 14.)  The Fine Survey also "shows a waterway crossing the western boundary of Warrant 1179 . . . near [its] northwest corner."  (Id. ¶ 15.)

The Bingham Estate conveyed, without a survey, the unsold portions of Warrant 1179 to William, Oliver and Mark Hoyt (the Hoyts) on June 23, 1882.  (Id. ¶¶ 17-18.)  This deed (Hoyt Deed) likewise mentioned the Repherd Tract in relation to the southern border of Warrant 1180.  (Id. ¶ 17; R.R. at 729a.)  Through various deeds and tax sales between 1893 and 2001, these portions of Warrant 1179 were conveyed to multiple, successive owners, with Company eventually purchasing the land in 2001.  (FOF ¶¶ 19-28, 38-40, 44.)  The deeds continued to reference the southern line of Warrant 1180 abutting the Repherd Tract.  (Id. ¶¶ 21, 24, 26-28.)  At one point, in August of 1952, the owner of Warrant 1179 conveyed a portion of property along its southern edge to an adjoining landowner to form a

5

consented boundary. (FOF ¶ 37.) In 1969, the Commonwealth and the owner of Warrant 1179 at the time, L.G. Niles Lumber Company (Niles), discussed a possible compromise line that would run diagonally from the upper left to the lower right of the Disputed Property. (Id. ¶ 45.) There was no deed executed and recorded reflecting that a settlement was reached and that land was transferred, but the alleged compromise line did appear in the Township's Tax Map, and the tax card for Mr. Niles suggested that a reduction of property had occurred. (Id.; R.R. at 1321a-22a.) Further, photographs were offered at the hearings that showed white paint marks or blazes on trees and rocks that would have been consistent with the Compromise Line asserted by Company. (R.R. at 1170a-1205a.)

In addition to the Ellis Surveys and Fine Survey, surveys of the area were performed in: 1910 by L.M. Otto, Jr. (Otto Survey); 1952 by Tom O. Bietsch (Bietsch Survey); 1998 by Boyer Kantz, PLS (Kantz Survey) (of the southern boundary of Warrant 1179); and 2004 by P.S. Cunningham (Cunningham Survey). (FOF ¶¶ 22-23, 31-36, 41-43, 49-52.) All the surveys, except the Bietsch Survey and the Cunningham Survey, show a waterway crossing the western border of Warrant 1179 near its northwestern border and reference the stone piles along the Repherd Tract at the southern boundary of Warrant 1180. (Id. ¶¶ 5, 15, 23, 42, 48.) In contrast, the Bietsch Survey shows the water crossing significantly south of the northwestern border of Warrant 1179, the Cunningham Survey does not show a waterway crossing Warrant 1179 at all, and neither survey references the Repherd Tract. (Id. ¶¶ 33, 36, 51-52; R.R. at 804a, 1043a.) After counsel for the owner of Warrant 1179 in 1952 could not "locate . . . a definite point whereby [Surveyor Bietsch] would be able to fix the Northern line of Warrant . . . 1179," Surveyor Bietsch placed the northern line 431 ½ perches/rods "north of the identified

6

southern line without any reference to the . . . Repherd [Tract] and showed this boundary of [Warrant 1179] as a single straight line." (FOF ¶¶ 32-33.) The Cunningham Survey relied on the Bietsch Survey. Mr. Sher presented CAD calculations that showed the waterway crossing Warrant 1179's western border south of the Disputed Property and significantly south of the northern boundary of Warrant 1179. (Id. ¶ 48; R.R. at 916a.)

The experts testified as follows. P.S. Cunningham testified, based on his survey, the Bietsch Survey, and other evidence, that the boundary between Warrant 1179 and Warrant 1180 was at the northern part of the Disputed Property and, therefore, the entire Disputed Property belonged to Company. (R.R. at 340a-52a, 360a.) P.S. Cunningham further questioned aspects of the Otto Survey and Fine Survey. (R.R. at 367a-69a.) DCNR's director of field engineering, P.S. Cook, testified that he had advised Company's prior counsel that, based on the monumentation identified in the Fine Survey and not the inconsistent Bietsch Survey, DCNR considered Company's actions an encroachment on Commonwealth property. (FOF ¶ 53.) P.S. Cook opined that the Otto Survey and Fine Survey were consistent with the Ellis Surveys and the physical features of the land, based on data collected by the Bingham Estate. (Id. ¶ 54.) Accordingly, P.S. Cook considered the boundary between Warrant 1179 and Warrant 1180 to be the more southern line identified by Mr. Sher and P.S. Cunningham, which meant that the Disputed Property is owned by DCNR. P.S. Cook explained that P.S. Cunningham "placed the southern boundary of Warrant 1179 too far north, thereby pushing" Warrant 1179's northern boundary too far north and encroaching on Warrant 1180. (Id. ¶ 55; R.R. at 502a.) DCNR also presented the testimony of P.S. Daubert, who opined, using various surveys and survey notes, that the

Disputed Property was located within Warrant 1180 and belonged to DCNR. (R.R. at 648a-49a.)

After reviewing the entire record, the Board rejected the Bietsch Survey as not credible because Mr. Bietsch could not obtain any assistance from the deeds provided to find the dividing line, placed the northern line simply based upon a measurement from a southern line, did not reference the Repherd Tract, ignored the Repherd Tract by drawing the northern boundary of Warrant 1179 as a straight line, did not reflect any stones on the boundary line (unlike the other surveys), and placed the waterway crossing significantly farther south on Warrant 1179's western border than the other surveys. (Final Adjudication at 12-13.) The Board further noted that Surveyor Bietsch had also "overlooked considerable evidence in running lines in the disputed area." (Id. at 13.) The Board similarly rejected P.S. Cunningham's opinion, which relied on the Bietsch Survey for its starting point, as not credible because he "notes that the western end of the **southern** boundary of the [D]isputed [Property] is marked by an existing stone pile." (Id. (emphasis in original).) The Board further cited the facts that P.S. Cunningham's survey did not reference any waterway crossing the northwest corner of Warrant 1179 and that P.S. Cunningham's aerial photograph has the waterway crossing south of the southern boundary of the Disputed Property and significantly south of the northern boundary. (Id.; R.R. at 1043a, 1358a.) The Board concluded that "[t]hese facts are inconsistent with placing the dividing line on the northern boundary of the [D]isputed [Property], as [P.S.] Cunningham has opined is the correct line." (Final Adjudication at 13.) The Board credited the Otto Survey and Fine Survey as being consistent with the Ellis Surveys, based on the location of the waterway crossing Warrant 1179 and the contemporaneous Bingham Estate maps. (Id. at 13-14.) The

8

Board also noted that the stone piles marking various lines on the Repherd Tract were consistent with the boundary line. (Id. at 13.) Because P.S. Cook's opinion was based on the Ellis Surveys, Otto Survey, Fine Survey, and the Bingham Estate maps and data, the Board found it more credible. (Id. at 14.)

The Board then reviewed what it considered the relevant deeds, which were the deeds conveying the various properties from the Bingham Estate, the common grantor, to Blossburg and the Hoyts. Citing Baker v. Roslyn Swim Club, 213 A.2d 145, 149 (Pa. Super. 1965), the Board recognized that natural and artificial monuments[6] normally take precedence over record monuments, such as the boundary of an adjoining property. (Id. at 14-15.) However, the Board observed that neither the 1875 Blossburg Deed nor the 1882 Hoyt Deed identified any natural or artificial monument that can be found but do reference a common adjoiner, the Repherd Tract. (Id. at 14.) Like the Blossburg Deed and Hoyt Deed, the Repherd Tract deed (Repherd Deed) did not identify a natural or artificial monument that could be found, but in the years after it had been deeded, the Repherd Tract became well identified, and the Blossburg Deed and Hoyt Deed directly refer to and specify distances along the boundary that are consistent with the Repherd Deed. (Id.) The Board concluded that, because the stone piles, which are considered artificial monuments, found where the boundary between Warrant 1179 and Warrant 1180 crosses the Repherd Tract are consistent with the courses and distances cited in the Blossburg Deed and Hoyt Deed, the stone piles marked the appropriate boundary line between Warrant 1179 and Warrant 1180. (Id. at 15.) This line represents the southern boundary line of the Disputed Property.

---

[6] Monuments are visible markers or indications left on natural or other objects indicating the line of a survey. Grier v. Pa. Coal Co., 18 A. 480, 482 (Pa. 1889).

9

(Id.)  The Board rejected Company's arguments that the northern boundary line was correct because those arguments were based on the courses and distance from the southern border of Warrant 1179, and the monuments took precedence over the courses and distances.  (Id.)  Further, the Board noted that the southern boundary of Warrant 1179 had been disputed and subject to consented lines and, therefore, the Board did not accept that the current southern boundary of Warrant 1179 was the original southern boundary.  (Id. at 16.)  Finally, the Board held that there was no evidence that the Commonwealth ever entered into a settlement agreement with Mr. Niles to accept the Compromise Line and, therefore, it could not enforce that agreement and give a part of the Disputed Property to Company.  (Id.)  For these reasons, the Board dismissed Company's Complaint seeking to quiet title in the Disputed Property.  Company now petitions this Court for Review.[7]

## II.     Discussion
   *A.      Whether the Board erred in using a natural monument not referenced in the original Patent and artificial monuments associated with a*

---

[7] "Our scope of review, as statutorily mandated, requires us to affirm the Board's adjudication unless the adjudication is in violation of the petitioners' constitutional rights, or it is not in accordance with law, or if any finding of fact made by the Board and necessary to support its adjudication is not supported by substantial evidence."  Northrup v. Pa. Game Comm'n, 458 A.2d 308, 309 (Pa. Cmwlth. 1983).  However, we exercise *de novo* review over questions of law.  Mercury Trucking, Inc. v. Pa. Pub. Util. Comm'n, 55 A.3d 1056, 1082 (Pa. 2013).  Where this Court reviews the record to determine whether substantial evidence exists to support the findings, we must review the evidence in the light most favorable to the prevailing party.  Adams Outdoor Adver., Ltd. v. Dep't of Transp., 860 A.2d 600, 605 n.8 (Pa. Cmwlth. 2004).  "[S]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.  "It is irrelevant whether the record contains evidence to support findings other than those made by the fact-finder; the critical inquiry is whether there is evidence to support the findings actually made."  Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Review, 949 A.2d 338, 342 (Pa. Cmwlth. 2008).

10

*subsequently conveyed property to identify the location of the boundary line of the Disputed Property.*

Company first argues that the Board erred in relying on the location of the waterway crossing and the stone piles associated with the Repherd Tract to ascertain the location of the boundary between Warrant 1179 and Warrant 1180, where the stone piles and waterway crossing were not referenced in any deeds or in the Ellis Surveys. According to Company, if there is no conflict in the calls of the deed, here the Patents, there is no need to choose one call over the other. Pencil v. Buchart, 551 A.2d 302, 307 (Pa. Super. 1988) (citing cases that applied the general rules of hierarchy where there are "conflicts between acreage or courses and distances and monuments recognized or described in the deed"). Moreover, it asserts that the general rule of hierarchy of calls, i.e., natural monuments, artificial monuments, adjacent boundaries, and then course and distances, will yield if its use would be inconsistent with the intention of the parties establishing the boundaries. Id. at 306. Company maintains that there is no inconsistency in the calls in the Patents, which are the monuments, distances, acreage, and adjoiner with John Barron warrants to the south of Warrant 1179. Rather, Company claims that the problem is that the original monuments set forth in the Patents for the boundary between Warrant 1179 and Warrant 1180, the trees on the corners, no longer exist. Thus, the Board should have used the courses and distances, based on the clearly established northern boundary of the John Barron warrants (which is the southern boundary of Warrant 1179) as the starting point, to find that Warrant 1179's boundary with Warrant 1180 was the northern boundary of the Disputed Property, as opined by P.S. Cunningham. Company argues that the Board's finding that it could not use the current southern boundary of Warrant 1179, as

11

used by Surveyor Bietsch and P.S. Cunningham, because it had been subject to historical disputes is not supported by substantial evidence.

DCNR responds that the Board did not err in relying on the natural monument (the waterway crossing), the artificial monuments (the stone piles on the adjoining Repherd Tract), and the common adjoining property (the Repherd Tract) to find that the boundary between Warrant 1179 and Warrant 1180 was the southern boundary of the Disputed Property. According to DCNR, the waterway crossing was reflected in the original Ellis Surveys, in the survey notes of the Bingham Estate, and in the Otto Survey. (R.R. at 685a-86a, 1362a, 1459a, 1466a.) Further, P.S. Daubert's testimony and exhibits, which relied on both the Bingham Estate survey notes and the Otto Survey, support the Board's boundary determination. That testimony also demonstrated how the Bietsch Survey and Cunningham Survey were inconsistent with the natural and artificial monuments, as described in the Bingham Estate survey notes. Finally, DCNR asserts that the Board's decision not to rely on the current southern boundary of Warrant 1179 as the starting point to measure the 431 ½ perches north to find the northern boundary of Warrant 1179, which is the Disputed Property's boundary with Warrant 1180, is supported by the testimony of P.S. Daubert and P.S. Cook indicating that there was an encroachment of the original southern boundary of Warrant 1179 by the owners of Warrant 1968, located directly south and adjoining Warrant 1179. Such encroachment was depicted as early as the Otto Survey in 1910 and observed in subsequent survey maps, as well as in other documents.

In an action to quiet title, the plaintiff (here, the Company) bears the burden of proof to establish title by a fair preponderance of the evidence. Kaiser Energy, Inc. v. Com., Dep't of Envtl. Res., 535 A.2d 1255, 1257-59 (Pa. Cmwlth. 1988).

12

"Moreover, whether the matter sounds in ejectment or quiet title, the moving party must recover on the strength of its own title and not upon the weakness of the Commonwealth's." Id. at 1257.

In boundary dispute matters, the purpose of the adjudicator "is to ascertain the intent of the grantor at the time of the original subdivision." Pencil, 551 A.2d at 305-06. The general rule provides that "[w]here the calls for the location of boundaries to land are inconsistent, other things being equal, resort is to be had first to natural objects or landmarks, next to artificial monuments, then to adjacent boundaries (which are considered a sort of monument), and thereafter to courses and distances." Baker, 213 A.2d at 149 (emphasis omitted). "[W]here there is a conflict between courses and distances or quantity of land and natural or artificial monuments, the monuments prevail." Pencil, 551 A.2d at 306. However, the rules of construction with regard to boundaries "[are] not . . . imperative or exclusive" but are aids in construction "to ascertain, or to aid in determining, the intention of the parties" that must yield to a contrary showing. Stark v. Equitable Gas Co., LLC, 116 A.3d 760, 765 n.7 (Pa. Cmwlth. 2015) (citing Baker, 213 A.2d at 149). Thus, these rules do not apply "where the monument claimed is so manifestly wrong as to lead to an absurd result." Post v. Wilkes-Barre Connecting R.R. Co., 133 A. 377, 378 (Pa. 1926); Stark, 116 A.3d at 765 n.7. Monuments not mentioned in a deed may be utilized if "said monuments are afterward erected by the parties with intent to conform to the deed." Pencil, 551 A.2d at 306 (internal quotation omitted). Nevertheless, if "the monuments are doubtful, a resort will be had to the courses, distances, and quantity." Post, 133 A. at 378. "Before a physical monument is accepted as a boundary line, there must be evidence other than its mere existence that the monument was intended for that purpose" which

13

may be shown if it is mentioned in deeds related to the chain of title or there is "evidence that any past parties erected it as a monument to mark the boundary." Pencil, 551 A.2d at 307. These general rules will yield "'where, in any given case, a consideration of all the facts and circumstances shows'" that one method would "'be the more reliable or certain.'" Stark, 116 A.3d at 765 n.7 (quoting Baker, 213 A.2d at 149). Questions regarding the location of boundaries are a question of fact for the fact-finder. Baker, 213 A.2d at 148.

We first address Company's contention that, pursuant to the Patent, the Board should have used the current, identified southern boundary of Warrant 1179, cited by P.S. Cunningham, as the original southern boundary, which would make it the northern boundary of the John Barron warrant, and result in Company being the owner of the Disputed Property. We have carefully reviewed the record, and the surveys, maps, and testimony which the Board credited, support the Board's finding that the southern boundary of Warrant 1179 had been encroached upon and subject to a compromise. (R.R. at 461a-63a, 687a-90a, 694a-95a, 804a, 1362a, 1459a, 1475a.) The Board could therefore find that the current southern boundary of Warrant 1179 is an unreliable place from which to ascertain the northern boundary of Warrant 1179 at issue in this matter. Moreover, to the extent that the use of the more northerly boundary proposed by DCNR would result in Warrant 1179 being smaller in acreage than Warrant 1180, that result likewise could be the result of the encroachment and compromise of the original southern boundary of Warrant 1179. Thus, none of the Patents' calls were of assistance in ascertaining the boundary between Warrant 1179 and Warrant 1180.

The Board relied on the Blossburg Deed and Hoyt Deed for assistance in ascertaining the intent of the grantor at the time of the original subdivision. Pencil,

551 A.2d at 305-06. Both deeds mention the prior common adjoiner, the Repherd Tract, as do the subsequent deeds transferring those properties. The fact that the stone pile monuments were not mentioned in the original deeds is not dispositive, id. at 307, as it appears from the credited evidence that several stone piles were erected that correspond with the calls and distance in the Repherd Deed, as well as numerous other deeds that followed which conveyed Warrant 1179 and Warrant 1180. In addition, although the waterway crossing is not expressly mentioned as a natural monument in the Patent for Warrant 1179 or in Surveyor Ellis' written survey, its location is identified in Surveyor Ellis' drawing accompanying his survey, subsequent surveys, and survey notes of Warrant 1179 that show, among other things, the various natural features of the land being surveyed in conjunction with the land's boundaries. As noted by the Board, the waterway crossing's location as being near the northwest corner of Warrant 1179 is consistent throughout the surveys, survey drawings, and survey notes, with the exception of the Bietsch Survey and Cunningham Survey. The location of the boundary is a question of fact for the Board, Baker, 213 A.2d at 148, and the Board weighed the evidence of the consistency of the identification of the waterway crossing and the references to the Repherd Tract in the surveys, survey drawings, survey notes, and deeds against P.S. Bietsch's and P.S. Cunningham's use of the compromised southern boundary of Warrant 1179 and determined that the former was worthy of more weight and credibility. Viewing the evidence in the light most favorable to DCNR as the prevailing party, Adams Outdoor Advertising, Ltd. v. Department of Transportation, 860 A.2d 600, 605 n.8 (Pa. Cmwlth. 2004), the Board's determination is supported by substantial evidence. Thus, given the consistency of the credited evidence relied upon the Board, "the monument[s] claimed [by DCNR

15

and the Board are not] so manifestly wrong as to lead to an absurd result." Post,
133 A. at 378.

> B.    Whether the Board's determination of the boundary between Warrant
> 1179 and Warrant 1180 is supported by substantial evidence.

Company asserts multiple reasons why the Board's findings are not
supported by substantial evidence. According to Company, the Board erred or
abused its discretion in: (1) relying on the waterway crossing, the location of the
Repherd Tract, and the Fine Survey because this evidence does not constitute
substantial evidence when reviewed; (2) relying on hearsay statements regarding
the Bietsch Survey to reject that survey; and (3) by making credibility
determinations regarding P.S. Cunningham's testimony where two of the three
Board members were not present during his live testimony. We address each
argument in turn.

> **1.    Whether the location of the waterway crossing Warrant
> 1179 and location of the Repherd Tract constitute
> substantial evidence to support the Board's findings.**

Company asserts that the Board's reliance upon the location of the waterway
crossing is not supported by substantial evidence because, in addition to it not
being mentioned in the Patent, there is no indication that Surveyor Ellis intended it
to be a monument and various reproductions of the drawings show the waterway
crossing at slightly varied locations on northwestern boundary of Warrant 1179.
(R.R. at 719a, 1324a-25a.) It further argues that the Board also should not have
relied upon the location of the Repherd Tract to ascertain the location of the
boundary because the Repherd Deed did not reference stone piles, trees, or
monuments, there was no definitive evidence showing that the Repherd Tract was
located in both Warrant 1179 and Warrant 1180, and did not change the length of

16

the western boundaries of Warrant 1179 and Warrant 1180. Company challenges the Fine Survey and its reliance on the stone piles because such piles were not mentioned in the Repherd Deed and Surveyor Fine, himself, built and witnessed one of the stone piles, thereby creating one of the corners of the Repherd Tract. It further asserts that, contrary to the Board's findings, the distances did not comport with those in the subsequent deeds and that the Otto Survey, and other surveys, relied upon by the Board are flawed.

DCNR maintains that the Board's credibility and evidentiary weight determinations are not subject to review on appeal and that it relied upon prior relevant surveys and associated credible testimony of DCNR's expert witnesses to make its determination as to the location of the boundary between Warrant 1179 and Warrant 1180. Here, the Board chose to credit and give more weight to the surveys of Surveyor Ellis, Surveyor Otto, Surveyor Fine, and the testimony of Surveyor Cook, and that evidence supports the Board's findings. Notably, Surveyor Otto noted in his survey that there was an "Old Birch Stump" on the northwest corner of Warrant 1179 and southwest corner of Warrant 1180, which was the type of tree referenced in the Patent, as well as in the Hoyt Deed, as being in that corner. (R.R. at 729a-31a, 956a-88a, 1362a-68a.) Like the Ellis Surveys, the Otto Survey visibly references the waterway crossing; thus, the Otto Survey is consistent with the Ellis Surveys. (R.R. at 389a-90a.) The Otto Survey also references the Repherd Tract, and that he found "posts & stones" along that tract consistent with the measurements in the Repherd Deed and placed the boundary of Warrant 1179 and Warrant 1180 where the Board ultimately found it to be. (R.R. at 1362a.) Such monuments and measurements were consistently mentioned or identified in the subsequent surveys and deeds, with the exception of the Bietsch

17

Survey and Cunningham Survey. This boundary is consistent with the subsequent deeds conveying Warrant 1179, as well as P.S. Cook's 2005 letter to Company regarding the Disputed Property. (R.R. at 431a, 763a-75a, 1373a-74a.)

Initially, we observe that Company made these evidentiary challenges regarding the accuracy of the depictions of the waterway crossing and Repherd Tract to the Board, the Board weighed the conflicting evidence, and the Board gave DCNR's evidence more weight and credibility than Company's evidence. To the extent that the maps show the waterway crossing at slightly varied locations on the northwestern corner of Warrant 1179, these variations are minimal, Surveyor Bietsch placed the location significantly farther south on Warrant 1179's western border than the other surveys, and P.S. Cunningham did not include the waterway crossing in his survey. Moreover, "[i]t is irrelevant whether the record contains evidence to support findings other than those made by the fact-finder; the critical inquiry is whether there is evidence to support the findings actually made." Ductmate Indus., Inc. v. Unemployment Comp. Bd. of Review, 949 A.2d 338, 342 (Pa. Cmwlth. 2008). Accordingly, there was substantial evidence to support the Board's reliance on these items in determining the location of the boundary.

> **2.    Whether the Board improperly relied upon hearsay evidence to reject the Bietsch Survey.**

Company next argues that the Board's rejection of the Bietsch Survey as not credible was based on its conclusion that Surveyor Bietsch "overlooked considerable evidence in running lines in the disputed area." (FOF ¶ 34.) This conclusion was based on a hearsay statement contained within a memo from Surveyor Fine, drafted in 1958, in which he states that Mr. Rex discussed the surveys with Surveyor Bietsch and told Surveyor Fine that Surveyor Bietsch left Mr. Rex "with the distinct impression that it is possible that he overlooked

18

considerable evidence in running lines in this area." (R.R. at 1382a.) Company therefore argues that what Mr. Rex told Surveyor Fine about what Surveyor Bietsch said is hearsay and should not have been used to reject the Bietsch Survey, particularly where the memo goes on to say that Surveyor Bietsch continued to believe that his survey was correct.

"One of the exceptions to the hearsay exclusionary rule pertains to declarations by a surveyor." Niles v. Fall Creek Hunting Club, Inc., 545 A.2d 926, 933 (Pa. Super. 1988). "This exception holds that declarations of a deceased surveyor regarding a line surveyed are admissible in boundary disputes." Id. (citing Laidley v. Rowe, 119 A. 474, 477 (Pa. 1923)). "Authenticated field notes of a deceased surveyor are also admissible," but "the deceased surveyor exception applies only to observations and notes made by the surveyor which relate to his surveying duties." Niles, 545 A.2d at 933. In other words, "the declarant must have been on the land at the time the declaration was made and engaged at the time in pointing out the boundaries of the land." Id. (citing Collins v. Clough, 71 A. 1077, 1080 (Pa. 1909)). Here, the statement referenced in Surveyor Fine's memo was not made in his role as a surveyor in his notes relating to his surveying duties, i.e., on the ground during the survey. Rather, it was made in a memo related to disputed property. Therefore, it would not fall within this exception to the hearsay rule. However, the Board gave several other objective reasons for not crediting the Bietsch Survey, including the more southerly location of the waterway crossing and the lack of reference to the Repherd Tract in that survey. Accordingly, there was no abuse of discretion in the Board finding the Bietsch Survey not credible.

       **3.    Whether the Board abused its discretion in making credibility determinations regarding P.S. Cunningham's testimony.**

19

Company acknowledges that credibility determinations are typically a matter firmly for the fact-finder, but argues that the Board here abused its discretion in rejecting P.S. Cunningham's testimony as not credible. First, Company asserts that the Board could not base its credibility determination on P.S. Cunningham's demeanor because two of the three Board members were not present at the hearings. Second, Company argues that the Board could not rely on the location of the waterway crossing as an objective reason for rejecting P.S. Cunningham's testimony because the Board should not have considered the location of the waterway crossing in the first instance and the reasons given are not supported by substantial evidence and can be reversed on appeal. Aetna Life Ins. Co. v. Montgomery Cnty. Bd. of Assessment Appeals, 111 A.3d 267, 279 (Pa. Cmwlth. 2015). Third, Company asserts that, unlike DCNR's expert witnesses, P.S. Cunningham actually surveyed the lands at issue.

DCNR replies that administrative adjudicators are permitted to determine the credibility of witnesses from reading a transcript, and administrative agencies frequently use a system where a hearing examiner takes the evidence, but the ultimate fact-finder is the board or commission. Cavanaugh v. Fayette Cnty. Zoning Hearing Bd., 700 A.2d 1353, 1355-56 (Pa. Cmwlth. 1997); Kramer v. Dep't of Ins., 654 A.2d 203, 206 (Pa. Cmwlth. 1995). Thus, a board or commission has the power to make findings of fact solely on its review of the record. Kramer, 654 A.2d at 206. Such a process does not deny a litigant any due process rights. R. v. Dep't of Pub. Welfare, 636 A.2d 142, 145 (Pa. 1994). Here, all of the Board members reviewed the full record from the two-day hearing before making the decision to dismiss the Complaint. They were acting within their authority when they made their credibility determinations, and such determinations

are not reviewable by this Court. Moreover, the bases on which the Board rejected the Bietsch Survey and P.S. Cunningham's testimony and evidence are supported by substantial evidence.

As with other administrative agencies, all determinations of witness credibility and evidentiary weight are solely within the province of the Board. Pa. Game Comm'n v. K.D. Miller Lumber Co., Inc., 654 A.2d 6, 9-10 (Pa. Cmwlth. 1994). "[I]t is not the function of this court to judge the weight and credibility of the evidence given before an administrative agency." Id. at 10. As noted by DCNR, administrative agencies frequently make credibility determinations on records made before a hearing officer or administrative law judge. Cavanaugh, 700 A.2d at 1355-56; Kramer, 654 A.2d at 206. As discussed above, the Board did not err or abuse its discretion in considering the position of the waterway crossing on Warrant 1179 in ascertaining the location of the boundary or in finding the Bietsch Survey not credible. Thus, the Board did not abuse its discretion in utilizing this objective basis as a reason to find P.S. Cunningham's testimony not credible. Moreover, that P.S. Cook and P.S. Daubert did not personally survey the land in question goes to the weight of that testimony, which is within the Board's province as fact-finder.

> C.    *Whether the Board's finding that there was no settlement agreement between the Commonwealth and Mr. Niles that established a Compromise Line is supported by substantial evidence.*

Company finally argues that the Board's finding regarding its alternative argument, that there was no evidence of a settlement agreement between the Commonwealth and Mr. Niles that established a Compromise Line, is not supported by substantial evidence. Company observes that establishing a consentable line by dispute and compromise or by recognition and acquiescence is

21

not subject to the statute of frauds and can be proven by parol evidence of an oral agreement. Plauchak v. Boling, 653 A.2d 671, 675 (Pa. Super. 1995). Thus, contrary to the Board's determination, the absence of a recorded deed transferring land does not mandate the conclusion that no consentable line existed or that there is not an agreement the Board can enforce. The Board did not consider the other evidence in the record that would support the existence of the Compromise Line, specifically, the 1969 map prepared by the Commonwealth showing the Compromise Line, Tioga County tax records showing a compromise line, the deposition of Mr. Niles from a prior case indicating that a compromise had occurred, and the photographic evidence indicating that trees and rocks were marked with white paint along what would be the Compromise Line.

DCNR asserts that the evidence does not show that the Commonwealth agreed to the Compromise Line; at most, the evidence demonstrates that a Compromise Line may have been a part of a settlement discussion between Mr. Niles and the Commonwealth. An offer of compromise is not admissible as evidence to show an admission of that party. Rochester Mach. Corp. v. Mulach Steel Corp., 449 A.2d 1366, 1370 (Pa. 1982). DCNR asserts, therefore, that given the unknown context of the alleged Compromise Line, the Board properly declined to give any credence to the evidence.

"The doctrine of consentable line is a rule of repose for the purpose of quieting title and discouraging confusing and vexatious litigation." Plauchak, 653 A.2d at 675. It is an ancient doctrine[8] that "is a separate and distinct theory from that of traditional adverse possession." Id. Under this doctrine,

_____

[8] Reference to the doctrine can be found as early as 1840 in Brown v. McKinney, 9 Watts 565, 566-67 (Pa. 1840).

22

if adjoining landowners occupy their respective premises up to a certain line which they mutually recognize and acquiesce in for the period of time prescribed by the statute of limitations, they are precluded from claiming that the boundary line thus recognized and acquiesced in is not the true one.

Plauchak, 653 A.2d at 675 (internal citation omitted). It is a form of estoppel, whereby once "a consentable line has been clearly established . . . , the line becomes binding under application of the doctrine of estoppel after twenty-one years." Plauchak, 653 A.2d at 677; see also Niles, 545 A.2d at 930 (same); Newton v. Smith, 40 Pa. Super. 615, 616 (1909) (stating "where such a line has been clearly established and the parties on each side take possession or surrender possession already held up to that line, it becomes binding, under the application of the doctrine of estoppel"). In fact, our Supreme Court has considered the equities in reviewing claims under the doctrine. Miles v. Pa. Coal Co., 91 A. 211, 212 (Pa. 1914). "The establishment of a consentable line is not a conveyance of land within the meaning of the Statute of Frauds because no estate is thereby created." Plauchak, 653 A.2d at 675 (citing Hagey v. Detweiler, 35 Pa. 409, 412 (1860) (footnote omitted)). "Therefore such a line may be initiated by oral agreement and proved by parol evidence." Id.

There are "two ways in which one may prove a consentable line: [(1)] by dispute and compromise, or [(2)] by recognition and acquiescence." Niles, 545 A.2d at 930. A consentable line by dispute and compromise is established by showing evidence of:

(1) a dispute with regard to the location of a common boundary line, (2) the establishment of a line in compromise of the dispute, and (3) "the consent of both parties to that line and the giving up of their respective claims which are inconsistent therewith." Newton [. . .], 40 Pa. Super. [at] 616 . . . . "[W]here such a line has been clearly

23

established and the parties on each side take possession or surrender possession already held up to that line, it becomes binding, under the application of the doctrine of estoppel." Id.

Although the parties may be bound if, merely having doubt as to the correct boundary location, they enter into a compromise, a "consentable line" is not created "if the parties, from misapprehension, adjust their fences, and exercise acts of ownership, in conformity with a line which turns out not to be the true boundary; or permission be ignorantly given to place a fence on the land of the party . . . ." Perkins v. Gay, 3 S. & R. 327, 331 (1817).

The establishment of this kind of boundary is always a matter of compromise, in which each party supposes he gives up for the sake of peace something to which in strict justice he is entitled . . . . Id. at 332.

Id. (internal quotation omitted).[9]

"The requirements for establishing a binding consentable line by recognition and acquiescence are: (1) a finding that each party has claimed the land on his side of the line as his own; and (2) a finding that this occupation has occurred for the statutory period of twenty-one years." Plauchak, 653 A.2d at 675. "In such a situation, the parties need not have specifically consented to the location of the line." Id. at 676. "'It must nevertheless appear that for the requisite twenty-one years a line was recognized and acquiesced in as a boundary by adjoining landowners.'" Id. at 676 (quoting Inn Le'Daerda, Inc. v. Davis, 360 A.2d 209,

---

[9] In Niles, which involved land near Warrant 1179 and Warrant 1180, the consent "line had been blazed and painted," was included in the description of the property prepared by the surveyor, as well as in a deed transferring land along that line from one of the parties to a third party. Niles, 545 A.2d at 931. A wire was also strung up along the boundary line and the parties posted signs with the agreed-upon survey line, which all observed as the boundary line. Id. Although the Superior Court concluded that it was likely that Mr. Niles established that a consentable line was created, the matter was reversed and remanded due to erroneous evidentiary rulings and jury instructions made by common pleas.

24

215-16 (Pa. Super. 1976)). "[A]cquiescence in the context of disputed boundaries denotes passive conduct on the part of the lawful owner consisting of failure on his part to assert his paramount rights or interests against the hostile claims of the adverse user." Zeglin v. Gahagan, 812 A.2d 558, 562 n.5 (Pa. 2002) (case involving adverse possession). A consentable line by recognition and acquiescence is typically established by a fence, hedgerow, tree line, or some other physical boundary by which each party abides. However, the fence line need not be as substantial as that required for adverse possession. Niles, 545 A.2d at 931. Notwithstanding this general proposition, in Miles, the Supreme Court observed that the fact that parts of the consentable line involved were "marked on the ground," as well as by fences, and were maintained demonstrated that the boundary had been acquiesced in by the parties. Miles, 91 A. at 212.

Here, the Board found that "no deed was executed and recorded to show that a settlement was ever reached" between Mr. Niles and the Commonwealth. (FOF ¶ 45.) Therefore, the Board rejected Company's argument that there was a consentable line in relation to the disputed boundary line. (Final Adjudication at 16.) However, the fact that there was no written or recorded document identifying the line or transferring real estate is not determinative that no agreement was reached because a consentable line is not a conveyance of land and can be established using parol evidence. Plauchak, 653 A.2d at 675. Although no deed was presented showing a transfer of the land, a review of the record reveals that there is deposition testimony by Mr. Niles given in 1985 regarding a compromise or agreement with the Commonwealth, a reference in a Tioga County tax record appearing to be for Mr. Niles' property, indicating "deed due to reduce acreage to 2119.5 from PA Dept of Forestry & Waters 3/25/71," maps showing a potential

25

Compromise Line, and pictures of white paint blazes painted on trees and stones along the suggested Compromise Line.   (R.R. at 1163a-1209a, 1236a-38a, 1321a-22a.)  Thus, we disagree that there was no evidence in the record for the Board to review and consider on Company's alternative argument.  Accordingly, in order to determine whether there was a consentable line, the Board must consider whether: (1) the suggested line, white paint blazes marked on trees and stones along the alleged Compromise Line, are sufficient; and (2) there was actual acquiescence of the parties to that Compromise Line for the twenty-one year period required.  The Board did not consider the evidence Company presented in an effort to establish the existence of a Compromise Line.  As such, we must vacate the Board's Order and remand the matter to the Board to consider that evidence and make a determination regarding the existence and location of the Compromise Line.

 

 

 

_____

**RENÉE COHN JUBELIRER,** Judge

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Long Run Timber Company,     :
Limited Partnership,     :
                Petitioner     :
     :
            v.     :   No. 2313 C.D. 2015
     :
Department of Conservation and     :
Natural Resources,     :
              Respondent     :

# O R D E R

NOW, August 30, 2016, the Order of the State Board of Property (Board) is hereby **VACATED**, and the matter is **REMANDED** for the Board to review the existing record evidence and issue a new determination in accordance with the foregoing opinion.

Jurisdiction relinquished.

_____
**RENÉE COHN JUBELIRER,** Judge